## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| FRIENDS OF ANIMALS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2081 (RC) |
| | : | | |
| v. | : | Re Document No.: | 17 |
| | : | | |
| MARTHA WILLIAMS, *et al.*, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### Granting in Part Defendants' Motion for Voluntary Remand Without Vacatur

## I.  INTRODUCTION

Plaintiff Friends of Animals filed this suit in order to ask the Court to set aside the United States Fish and Wildlife Service's decision to list a rare species of parrot as merely threatened, rather than fully endangered, and to allow limited import and export of the bird without an Endangered Species Act permit.  Fish and Wildlife and its Principal Deputy Director now ask the Court to remand the challenged decisions for reconsideration after an intervening district court decision suggested that Fish and Wildlife's original analysis may have been incomplete.  The Court agrees that remand is appropriate, and concludes that the equities do not weigh in favor of vacating the permit-free trade rule during the remand.  However, the Court will retain jurisdiction over the action to ensure that the remand reconsideration proceeds apace and to facilitate speedy resolution of any of Friends of Animals's claims that a remand does not moot.

## II.  BACKGROUND

*A.m. macao*, the southern subspecies of the scarlet macaw, is a type of "large neotropical parrot species, with an average length of 89 centimeters."  Compl. ¶¶ 1, 63.  The southern subspecies consists of two distinct population segments ("DPS"), the Northern DPS and the

Southern DPS.  *See id.* ¶¶ 1, 113.  The range of the Northern DPS extends across "mainland Panama, northwest Colombia," and certain portions of Costa Rica.  *Id.* ¶ 70.

      In 2008, Friends of Animals, an animal advocacy organization, petitioned the United States Fish and Wildlife Service to list the Northern DPS as protected under the Endangered Species Act ("ESA").  *Id.* ¶¶ 20, 77.  This kicked off a process in which Fish and Wildlife examined whether the Northern DPS merited listing under the ESA and, if so, whether it should be listed as endangered or merely threatened.  An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range," while a threatened species is one that is "likely to become an endangered species within the foreseeable future."  *Id.* ¶ 29 (quoting 16 U.S.C. § 1532(6), (20)).  Once listed as endangered, a species automatically benefits from a variety of laws prohibiting trade or taking (*e.g.*, hunting, killing, capturing) of the species.  *Id.* ¶ 52; Mem. Supp. Federal Defs.' Mot. Voluntary Remand Without Vacatur at 4 ("Mem."), ECF No. 17 (collecting citations).  Section 4(d) of the ESA leaves the protections applicable to merely threatened species to the discretion of Fish and Wildlife, which may by regulation apply to a particular threatened species any of the protections that would apply were the species listed as endangered.  Mem. at 4 (citing 16 U.S.C. § 1533(d)).  For all species listed before September 26, 2019, Fish and Wildlife issued a "blanket protection" regulation that automatically extends to threatened species the import/export and "take" regulations applicable to endangered species.  Compl. ¶ 54; 50 C.F.R. § 17.31(a).  However, for any particular threatened species, Fish and Wildlife may issue a "special rule" specifying the specific protections and prohibitions that apply.  Compl. ¶ 54 (citing 50 C.F.R. § 17.31(c)).

      Friends of Animals's 2008 petition eventually culminated in Fish and Wildlife's 2012 decision to list the Northern DPS as endangered because of habitat loss, poaching, and the

inadequacy of existing regulations to address these threats.  *Id.* ¶¶ 79, 82, 111.  However, after a notice-and-comment rulemaking process commenced in 2016, Fish and Wildlife downgraded the listing of the Northern DPS from endangered to threatened on February 26, 2019.  *Id.* ¶¶ 112, 116.  Fish and Wildlife explained that it had reviewed additional information since the 2012 listing that "indicate[d] the populations in Costa Rica in the northern DPS of the southern subspecies of scarlet macaw (A. m. macao) are likely increasing."  Endangered and Threatened Wildlife and Plants; Listing the Scarlet Macaw, 84 Fed. Reg. 6278, 6279, 6281 (Feb. 2016, 2019).

In conjunction with downgrading the Northern DPS to threatened status, Fish and Wildlife issued a species-specific Section 4(d) rule, which, under certain circumstances, allows the import and export of Northern DPS macaws without an ESA permit.  Specifically, a Northern DPS macaw may be imported or exported without an ESA permit if it was held in captivity prior to the date of the listing of the species or was bred in captivity and is importable or exportable under the terms of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") and the Wild Bird Conservation ACT ("WBCA").  84 Fed. Reg. at 6309.  Additionally, certain interstate commercial activities are allowed without an ESA permit.  Decl. Gary Frazer ¶¶ 24, 30 ("Frazer Decl."), ECF No. 18-1.

Friends of Animals filed suit against Fish and Wildlife and Martha Williams, FWS's Principal Deputy Director (together, "FWS"), seeking vacatur of FWS's finding that the Northern DPS should be listed as threatened (the "Threatened Finding") and of the Section 4(d) rule.  Compl. at 23.  The Complaint includes two counts, one alleging that the Threatened Finding violates the ESA and is arbitrary and capricious under the Administrative Procedure Act ("APA") and one alleging that the Section 4(d) rule violates the ESA and is arbitrary and

capricious under the APA. *Id.* ¶¶ 171–74.  In support of these claims, Friends of Animals
pointed to the following five alleged shortcomings in FWS's decisionmaking process:

- FWS relied on "unverified, crowdsourced, and non-peer reviewed observations" to reach
  the Threatened Finding.  Pl.'s Opp'n Defs.' Mot. Voluntary Remand a 7 ("Opp'n"), ECF
  No. 19 (citing Compl. ¶¶ 120–37, 151–53).

- "FWS ignored the ESA's requirement to list a species as endangered if any of five factors
  are present." *Id.* (citing Compl. ¶¶ 71–153, 172).

- FWS "fail[ed] to consider the cumulative effect of the threats faced by the Northern
  DPS." *Id.* (citing Compl. ¶¶ 150–153, 172).

- "FWS utterly failed to consider whether the Northern DPS is endangered in a significant
  portion of its range." *Id.* (citing Compl. ¶¶ 119, 138–47).

- The Section 4(d) rule "fails to provide for the conservation of the Northern DPS by not
  sufficiently restricting trade in the birds and not considering whether to list the southern
  subspecies as endangered due to its similarity of appearance to the endangered northern
  subspecies of the scarlet macaw."[1] *Id.* (citing Compl. ¶¶ 154–70, 173–74).

After filing and then withdrawing a motion to dismiss, the government now moves for
voluntary remand of the Threatened Finding and the Section 4(d) rule so that it can further
consider the impact of a decision from another court in this district, *Center for Biological
Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), that came down after FWS issued the
Threatened Finding and the Section 4(d) rule.  Mem. at 10.  To explain, the ESA provides that a
species is endangered if it "is in danger of extinction throughout all *or a significant portion of its
range*."  16 U.S.C. § 1532(6) (emphasis added).  Before *Center for Biological Diversity*, FWS's
policy was to, as a first step, determine if a species was endangered or threatened throughout all
of its range. *Ctr. for Biological Diversity*, 435 F. Supp. 3d at 89.  If the answer was yes, the
species was either endangered or threatened throughout all of its range, FWS would simply list
the species as either endangered or threatened and not go forward with analyzing whether the

---

[1] FWS may treat a species as threatened or endangered on the ground that it is similar in
appearance to a threatened or endangered species such that enforcement personnel would have
difficulty in attempting to differentiate between the two species.  16 U.S.C. § 1533(e).

species was endangered or threatened in any particular significant portion of its range ("SPR").

Thus, if FWS determined at the first step that a species was threatened throughout its entire

range, it would not analyze whether the species, while merely threatened throughout its entire

range, was endangered in a significant portion of its range. *Id.* at 89–92. The court in *Center for*

*Biological Diversity* held that this policy (the "2014 SPR Policy") was inconsistent with the

ESA's plain text, which requires FWS to evaluate whether a species should be listed as

endangered because it is in danger of extinction in any significant portion of its range. *Id.* at 93,

98. In other words, *Center for Biological Diversity* suggests that Friends of Animals may very

well be right about one of its claims: that the Threatened Finding rested on incomplete analysis

because "FWS utterly failed to consider whether the Northern DPS is endangered in a significant

portion of its range." Opp'n at 7.

      In response to this intervening legal development, FWS moves for voluntary remand of

the Threatened Finding and the "accompanying" Section 4(d) rule in order to "reconsider its SPR

analysis based on the plain language of the ESA" and *Center for Biological Diversity* and to

solicit notice and comment on these issues. Mem. at 10–11. Friends of Animals opposes a

remand, and in the alternative argues that any remand should be accompanied by vacatur of the

Section 4(d) Rule. Opp'n at 10–21. The parties also dispute what sort of schedule should

govern any remand. *Id.*at 22–24; Mem. at 21–22.

### III.  ANALYSIS

### A.  Remand is Appropriate and Would Not Unduly Prejudice Friends of Animals

      The standards courts rely on to guide their discretion whether to grant an agency

defendant's voluntary remand motion generally favor remand. "Usually, courts 'grant an

agency's motion to remand so long as the agency intends to take further action with respect to

the original agency decision on review.'" *Rural Empowerment Ass'n for Cmty. Help v. EPA*, No. CV 18-2260, 2022 WL 444095, at *1 (D.D.C. Feb. 14, 2022) (quoting *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018)).  The D.C. Circuit has recognized an "intervening legal decision" as an appropriate basis for remand.  *See Util. Solid Waste Activities Grp.*, 901 F.3d at 436; *see also FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 73 (D.D.C. 2015) ("In general . . . '[w]hen an agency seeks a remand to take further action consistent with correct legal standards, courts should permit such a remand in the absence of apparent or clearly articulated countervailing reasons.'" (quoting *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416 (6th Cir. 2004)).[2]  An agency need not confess that its decision was erroneous in order to obtain a remand; it must simply present a reason for reconsideration that is not frivolous or in bad faith.  *See, e.g.*, *Rural Empowerment Ass'n for Cmty. Help*, 2022 WL 444095, at *1.  In addition, the reviewing court should "consider whether remand would unduly prejudice the non-moving party."  *See Util. Solid Waste Activities Grp.*, 901 F.3d at 436.

It is plain enough that FWS has presented a good-faith, non-frivolous reason for seeking remand.  It wishes to reconsider—or really, conduct for the first time[3]—the SPR analysis it conducted in connection with the Threatened Finding "based on the plain language of the ESA" and on an intervening legal development, the decision in *Center for Biological Diversity*.  This decision vacated the interpretive 2014 SPR Policy that governed when FWS made the

---

[2] The Federal Circuit, in *dicta*, has gone so far as to say that when there is an intervening event such as a new legal decision that "may affect the validity of the agency action," "[a] remand is generally *required*."  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) (emphasis added).

[3] Apparently because of its conclusion that the Northern DPS was threatened throughout its range, consistent with the governing 2014 SPR Policy, FWS did not go on to analyze whether any SPRs existed for the Northern DPS or whether the Northern DPS was endangered within any SPR when it issued the Threatened Finding.  *See* 84 Fed. Reg. at 6308.

Threatened Finding.  Mem. at 17; *see Ctr. for Biological Diversity*, 435 F. Supp. 3d at 98.

Indeed, the agency has already set a schedule for completion of its new SPR analysis (to include

solicitation of public comment) and, if that analysis warrants "uplisting" of the Northern DPS "to

endangered," a schedule for issuance of a proposed rule to that effect.  Frazer Decl. ¶ 19.  Thus, it

is clear that FWS "intends to revisit the challenged agency decision on review."  *Limnia, Inc. v.*

*United States Dep't of Energy*, 857 F.3d 379, 381 (D.C. Cir. 2017).  Indeed, FWS's

reconsideration, if it results in uplisting of the Northern DPS to endangered and an

accompanying rescission of the Section 4(d) rule, "may moot Plaintiff['s] claims, providing [its]

requested relief and saving the parties' and the Court's resources."  *Rural Empowerment Ass'n*

*for Cmty. Help*, 2022 WL 444095, at *2; Mem. at 11, 16 ("If the results of the SPR analysis

demonstrate that the Northern DPS should be uplisted to endangered," after seeking public

comment, the FWS will "send the proposed rule to uplist the northern DPS as endangered to the

Federal Register by March 28, 2024, together with any necessary proposed amendments to no

longer apply the species-specific 4(d) rule. . . . [I]f the uplisting is finalized it has the effect of

withdrawing the species-specific 4(d) rule."); Opp'n at 12 ("Admittedly, FWS would perform an

SPR analysis for the first time, which could conceivably lead it to correctly list the Northern DPS

as endangered.").

   Instead of arguing that FWS has not put forth a valid basis for remand,[4] Friends of

Animals contends that the requested remand would subject them to undue prejudice by delaying

---

[4] Friends of Animals briefly states that "[v]oluntary remand is not appropriate when it is motivated simply by a desire to avoid judicial review," Opp'n at 10, but unlike in the cases Friends of Animals relies on, the circumstances here do not suggest that avoidance of judicial review serves as FWS's motivation for moving for voluntary remand.  *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 348–49 (D.C. Cir. 1998) (agency presented a "last second motion to remand" "[a]lmost two months" after oral argument); *Lewis v. Sec'y of the Navy*, No. CV 10-0842, 2014 WL 12787221, at *4 (D.D.C. Sept. 2, 2014) (defendant had not presented

their ability to pursue their non-SPR-related claims and by "unnecessarily jeopardizing scarlet macaws." Opp'n at 10–17. Neither argument persuades the Court that Plaintiffs would suffer undue prejudice from the remand requested here.

### 1. Narrow Scope of the Proposed Remand Relative to the Complaint

Friends of Animals's first argument for prejudice turns on the fact that FWS has committed only to a limited scope of reconsideration on remand, namely that it will reconsider its SPR analysis in light of *Center for Biological Diversity*. FWS would *not* reconsider on remand the other, SPR-independent aspects of the listing decision that Friends of Animals challenges in the instant suit: its alleged reliance on unverified crowdsourced information, its allegedly faulty analysis of the five ESA factors, its alleged failure to consider threats cumulatively, and the alleged failure of the Section 4(d) rule to protect the Northern DPS. *See* Opp'n at 11–12.

This argument principally rests on a misreading of the D.C. Circuit's decision in *Limnia*, which reversed a district court's grant of a voluntary remand that "did not return the 'core dispute' . . . back for further proceedings by the agency." 857 F.3d at 386. Friends of Animals says that because "the list of what FWS would not reconsider is much longer than the single thing FWS would reconsider" on its proposed remand (the SPR analysis), the proposed remand would not return the core of the dispute to FWS. *See* Opp'n at 11–12. But by "core dispute," the D.C. Circuit did not mean that a remand must address all or most of the substantives issues a plaintiff's complaint raises about a particular agency decision. Instead, it meant that an agency

---

"'substantial and legitimate' concern with the procedural or substantive soundness of its prior action" and circumstances suggested the proposed remand was geared toward depriving the plaintiff of standing to challenge a regulation). The *Center for Biological Diversity* decision is powerful evidence that FWS has at least some substantial, good faith basis for re-evaluating the Threatened Finding.

must commit to reconsidering the challenged decision itself: "[V]oluntary remand is typically appropriate only when the agency intends to revisit the challenged agency decision on review." *Limnia*, 857 F.3d at 381.  Thus, the D.C. Circuit held that the Department of Energy could not obtain remand where it promised only that it would allow the plaintiff to apply anew to participate in a loan program, but would not reevaluate the challenged decisions to deny two of the plaintiff's previous applications.  *Id.* at 387–88.

Here, by contrast, FWS has committed to revisiting the very decisions Friends of Animals challenges, namely the Threatened Finding and, if the Threatened Finding was wrong, the resultant Section 4(d) rule.  *See* Mem. at 11, 16.  The proposed remand would, therefore, return the core dispute to the agency.  *See N. Alaska Env't Ctr. v. Haaland*, No. 20-CV-00187, 2022 WL 1556028, at *4 (D. Alaska May 17, 2022) ("The fact that Federal Defendants have not committed to specifically addressing each of Plaintiffs' claims on remand does not bar remand. The suitability of voluntary remand hinges on whether the agency has committed to revisiting 'the original agency decision on review,' not whether the agency will address every manner in which a party claims that decision was erroneous." (quoting *Limnia*, 857 F.3d at 386)); *Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 25 (D.D.C. 2008) ("The Court recognizes that plaintiffs allege that the section 404 permit at issue here is deficient for several reasons, only one of which relates to degradation of waters of the United States. Yet, the fact that plaintiffs assert more than one problem with the CCTC permit does not alter the factors assessed above that the Court considers in reaching its remand decision, and does not change the fact that the Corps may ultimately revoke the permit or modify its decision-making process in such a manner that would make these proceedings moot.").

Moreover, a remand will not cause Friends of Animals to lose the ability to pursue its non-SPR claims as a means of obtaining the relief it seeks, namely the uplisting of the Northern DPS to endangered and the accompanying withdrawal of the Section 4(d) rule.  If the SPR reconsideration does prompt FWS to uplist and withdraw, Friends of Animals will have no concrete need to pursue its other theories for why the Threatened Finding was invalid.  If, on the other hand, FWS's remand reconsideration causes it to stand by the Threatened Finding and Section 4(d) rule, Friends of Animals acknowledges that its ability to pursue its non-SPR theories against the Threatened Finding would not be thwarted.  Opp'n at 13.

Thus, the prejudice to Friends of Animals is not the loss of ability to pursue all challenges to the Threatened Finding, but the loss of the ability to do so *now*.  *Id.*  ("If FWS's SPR analysis does not result in an endangered finding, Friends of Animals would suffer a delay of more than a year—a delay it did not want and did everything it could to prevent—simply to get back to where it is now: in litigation, without Defendants having provided an administrative record, and without having briefed the merits of its claims.").  Given the resource efficiencies inherent in the possibility of FWS providing Friends of Animals all of the relief it seeks without the need for further litigation, this delay of potentially unnecessary litigation is not the sort of undue prejudice that defeats a request for voluntary remand.  *See FBME Bank Ltd. v. Lew*, 142 F. Supp. at 73 ("The question for the Court is . . . whether a voluntary remand would conserve the Court's and the parties' time and resources, without causing undue prejudice to [the plaintiff]"); *cf. Am. Wild Horse Pres. Campaign v. Salazar*, 115 F. Supp. 3d 1, 4–5 (D.D.C. 2012) ("[T]o the extent that Plaintiffs may claim hardship in being required to bring more than one legal challenge, the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe.").

2.  Potential Harm to Northern DPS Macaws

Friends of Animals next argues that remand would prolong in effect the Section 4(d) rule's sanction of some permit-free import of Northern DPS macaws, which they say is invalid and should be vacated.  This would "unnecessarily jeopardize[e] scarlet macaws" of the Northern DPS because "nothing in the [Section 4(d)] Rule requires a permit for the [import of] offspring of scarlet macaws captured from the wild, even if their parents were captured after the date of the ESA listing and bred purely for commercial purposes."  Opp'n at 14–15.  Thus, Friends of Animals says that the Section 4(d) Rule "incentivizes the removal of scarlet macaws from the wild for commercial breeding and shipment of their offspring to the United States without a permit."  *Id.*

FWS responds by emphasizing the level of protection Northern DPS macaws receive even under the Section 4(d) rule and insisting that the limited trade the rule allows does not present a significant threat.  Defs.' Reply Supp. Mot. Voluntary Remand Without Vacatur at 9–10 ("Reply"), ECF No. 20; Mem. at 20–21.  The Section 4(d) rule's allowance of import and export of Northern DPS macaws applies only to certain captive-bred birds and to those birds taken from the wild before the listing date of March 28, 2019, and anyone wishing to take advantage of this exception bears the burden of demonstrating that it applies.  Frazer Decl. ¶¶ 24, 29.  So, macaws taken from the wild during the requested remand may not be imported absent an ESA permit.  And under CITES, any macaw imported since 1976 may not be used for commercial purposes within the United States (absent a CITES exemption).  *Id.*; *see* 50 CFR § 23.55; Compl. ¶ 98.  Moreover, a variety of CITES provisions implemented through the ESA make it so that "there is virtually no current legal international trade in the species for commercial purposes, and any such trade to the U.S. would require a valid CITES . . .

certificate" establishing that the bird was acquired before CITES applied to it.  Frazer Decl. ¶ 26.

The WBCA also requires permits for the import of all CITES-listed birds, subject to certain

exceptions, and the Lacey Act Amendments of 1981 also prohibit the import of animals taken in

violation of various other laws.  *Id.* ¶¶ 27–28.  Finally, FWS declares that the Section 4(d) rule's

provision for interstate commercial activities "would apply primarily to scarlet macaws legally

captive-bred in the United States."  *Id.* ¶ 30.  The bottom line is that "all imports of scarlet

macaws require both a [WBCA] permit and a [CITES] permit."  Reply at 10.

Friends of Animals does not meaningfully dispute this legal framework.  Instead, it

argues about its effect on international trade in scarlet macaws.  This framework, Friends of

Animals says, "still incentivizes the removal of scarlet macaws from the wild for commercial

breeding and shipment of their offspring to the United States."  Opp'n at 15.  According to

Friends of Animals, by focusing on whether the bird was taken from the wild and on the date the

bird was taken from the wild, the Section 4(d) rule creates a "loophole": a trader could take a

bird from the wild even after March 28, 2019, breed it, and ship its offspring to the United States

without a permit.  *Id.*  Trade of scarlet macaws to the United States can be lucrative, with prices

that "may have exceeded" $2000 per bird in the past.  *Id.* at 16.  The WBCA allows import for

cooperative breeding programs, and the non-commercial purposes it permits still deplete the

population of the Northern DPS.  *See id.*  What is more, because it is difficult to differentiate

between the northern and southern scarlet macaw subspecies, importers can get away with

passing off a non-importable Northern DPS macaw as an importable southern DPS macaw.  *Id.*

at 16–17.

When the rubber meets the road, the only concrete information Friends of Animals

presents about trade in Northern DPS scarlet macaws—that "prices for scarlet macaws in the

United States may have exceeded $2,000 in 2007" and that "nearly 6,000 live scarlet macaws were traded internationally from 1985 to 2010"—tells the Court about the state of the scarlet macaw trade *before* the Northern DPS was listed under the ESA.  *Id.* at 16. (citing Endangered and Threatened Wildlife and Plants; Listing the Scarlet Macaw, 77 Fed. Reg. 40222, 40234 (July 6, 2012.  This sheds little light on the Section 4(d)-rule status quo that Friends of Animals claims subjects the Northern DPS to jeopardy.

On the other side stands the declaration of the Assistant Director for Ecological Services at FWS, submitted under penalty of perjury, that "there is virtually no current legal international trade in the species for commercial purposes" and that "[t]he best available data indicate that the current threat from trade to the scarlet macaw stems mainly from illegal trade in the domestic markets of Central and South America, and not from trade of scarlet macaws to, from, through or within the United States."  Frazer Decl. ¶ 27.  *Cf. Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 32 (D.D.C. 2013) ("[T]he determination by FWS—the expert agency—that the [species] would not suffer significant harm during the proposed remand period is entitled to some measure of deference."); *Bldg. Indus. Legal Def. Found. v. Norton*, 231 F. Supp. 2d 100, 106–07 (D.D.C. 2002).  Friends of Animals even appears to admit that it is "generally illegal to import" a Northern DPS macaw.  Opp'n at 17.  At the very least, it is clear that while the Northern DPS scarlet macaws would enjoy more comprehensive protection in the absence of the Section 4(d) rule, they are far from wholly unprotected under the status quo of the Section 4(d) rule.  Friends of Animals would not suffer undue prejudice from the requested remand.

## B.  Vacatur of the Section 4(d) Rule is Not Appropriate

As an alternative to opposing remand, Friends of Animals argues that "any remand should be accompanied by vacatur of the" Section 4(d) rule (but not of the Threatened Finding).

Opp'n at 17, 19.  The Court begins its evaluation of this request by emphasizing the early stage

of this litigation and, accordingly, the sparse state of the record.  The Court has not been

presented with the administrative record underlying the Threatened Finding and the Section 4(d)

rule, and neither party has presented any argument on the merits of Friends of Animals's

challenges.

Thus, Friends of Animals asks the Court to vacate the Section 4(d) rule without making

any determination on the merits of Friends of Animals's challenge to that rule.  It is far from

clear that the Court has the authority to vacate a rule without first having found it invalid on the

merits independently or as a result of all parties conceding the rule's invalidity.  Some courts in

this district have expressed skepticism that courts possess this authority.  *WildEarth Guardians v.

Bernhardt*, No. CV 20-56, 2020 WL 6255291, at *1 (D.D.C. Oct. 23, 2020); *Vanda Pharms.,

Inc. v. FDA*, No. CV 19-301, 2019 WL 1198703, at *2 (D.D.C. Mar. 14, 2019); *Carpenters

Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 133 n.7, 135–36 (D.D.C. 2010); *Nat'l Parks

Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 4–5 (D.D.C. 2009); *see also N. Alaska Env't

Ctr.*, 2022 WL 1556028, at *6.  Perhaps the most persuasive reasoning found within these

decisions is that the APA tells courts to "hold unlawful and set aside agency action, findings, and

conclusions *found to be*" unlawful, procedurally unsound, or arbitrary and capricious.[5]  5 U.S.C.

§ 706 (emphasis added); *see, e.g.*, *Carpenters Indus. Council* 734 F. Supp. 2d at 135–36.  On the

other hand, courts outside of this district have held that the APA's judicial review provision is

---

[5] Friends of Animals's challenge to the Section 4(d) rule asserts that is "is arbitrary, capricious, and contrary to law in violation of the ESA within the meaning of the APA."  Comp. ¶ 174.  In *Carpenters Indus. Council*, the agency defendant had requested vacatur, so the Court was further concerned that vacating would improperly allow the agency to repeal a rule without going through notice and comment requirements.  734 F. Supp. 2d at 135; *see also Nat'l Parks Conservation Ass'n*, 660 F. Supp. 2d at 5.  As FWS opposes vacatur of the Section 4(d) rule, this concern is not as salient in this case.

"not exclusive" and that district courts retain equitable discretion to vacate a rule even in the absence of a merits determination. *Ctr. For Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241–42 (D. Colo. 2011); *see also In re Clean Water Act Rulemaking*, 568 F. Supp. 3d 1013, 1022 (N.D. Cal. 2021); *Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth v. Salazar*, No. 07-CV-00876, 2009 WL 8691098, at *3 (D.N.M. May 4, 2009); *Citizens for a Healthy Cmty. v. United States Dep't of Interior*, No. 21-CV-01268, 2022 WL 1597864, at *6 (D. Colo. May 19, 2022).

Resolution of this split does not much matter for the purpose of deciding whether to vacate in this case. When courts have concluded that they retain equitable discretion to vacate absent a merits determination, they have exercised this discretion according to the familiar *Allied-Signal* factors that apply when courts decide whether to vacate or remand without vacatur after a merits analysis reveals a rule to be defective: (1) "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (citation omitted); *see Ctr. For Native Ecosystems*, 795 F. Supp. 2d at 1242; *Coal. of Arizona/New Mexico Cntys. for Stable Econ. Growth*, 2009 WL 8691098, at *3 ("[T]he equitable analysis that applies to determine vacatur is the same whether or not the Court reaches the merits of the underlying rule prior to remand."). Even assuming that the Court has the authority to vacate the Section 4(d) rule given the present posture of this case, the *Allied-Signal* factors do not counsel vacatur.

Friends of Animals's case for remand falters at the first *Allied-Signal Factor*. "[W]ithout delving into the merits, the seriousness of the rule's deficiencies cannot be definitively assessed." *Am. Forest Res. Council*, 946 F. Supp. 2d at 31. Assuming that *Center for Biological Diversity*'s

interpretation of the ESA is correct and therefore requires FWS to identify any SPRs for the Northern DPS and evaluate whether the species is endangered within them—something FWS does not quite seem to have conceded, though it does represent that it will conduct an SPR analysis, *see* Reply at 8–9; Frazer Decl. ¶ 19—the Court at this stage lacks the record necessary to assess whether the omission of an SPR analysis causes doubt as to "whether the agency chose correctly" when it listed the Northern DPS as threatened rather than endangered.  *Allied-Signal, Inc.* 988 F.2d at 150 (citation omitted).  "The 'seriousness' of a deficiency . . . is determined at least in part by whether there is a significant possibility that the agency may find an adequate explanation for its actions on remand."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (citation omitted).  On remand, FWS's analysis, undertaken with the benefit of public comment, could reveal that the Northern DPS is endangered within an SPR and therefore should have been listed as endangered, or it could determine either that there are no SPRs or that the Northern DPS is not endangered within any SPR, and, therefore, that the original listing decision and accompanying Section 4(d) rule were correct.[6]  *See* Frazer Decl. ¶¶ 20–21; Reply at 9.

Friends of Animals has provided the Court with little to suggest that the former outcome is any more likely than one of the latter ones.  *See* Opp'n at 7 (citing Compl. ¶¶ 119, 138–47 in support of the SPR claim); Compl. ¶¶ 119, 138–47 (alleging that deforestation renders the Northern DPS at risk of extinction in areas of Colombia and that there are very few scarlet

---

[6] It may also be possible that an SPR analysis reveals that FWS was correct to list the Northern DPS as threatened, but that even so, the species-specific Section 4(d) rule was unsound for some other reason.  But Friends of Animals directs its argument on the first *Allied-Signal* factor only to FWS's failure to conduct an SPR analysis, which goes to the question of whether FWS was correct to list the Northern DPS as threatened rather than endangered.  Opp'n at 19–20. This is somewhat curious, given that Friends of Animals also says that vacatur of the Threatened Finding "would be unwarranted."  *Id.* at 19.

macaws in Panama and Costa Rica but not explaining wither these areas constitute significant portions of the Northern DPS's range); Decl. of Stephen R. Hernick Ex. 2 at 7–8, ECF No. 19-1 (Friends of Animals asserting, in its notice-of-intent-to-sue letter, that the Northern DPS is close to extinct in parts of Costa Rica, Panama, and Colombia, and that the FWS should have considered whether these were significant portions of the Northern DPS's range).  Unlike the plaintiff in *Center for Biological Diversity*, for example, Friends of Animals cannot point to the "clear and undisputed fact that the [species at issue] has declined most significantly in the core of its range."  435 F. Supp. 3d at 69.  Even in the face of that representation, the court in *Center for Biological Diversity* did not vacate the challenged threatened listing, but instead remanded to FWS "to make a new listing decision consistent with" the court's holding that the 2014 SPR Policy was inconsistent with the ESA.  *Id.*  The same result is appropriate here.  Absent firm reason to conclude that the Threatened Listing and Section 4(d) rule were in fact deficient, the first *Allied-Signal* factor "does not weigh in favor of vacatur."  *Vanda Pharms., Inc.*, 2019 WL 1198703, at *2.[7]

---

[7] Friends of Animals relies on *Friends of Animals v. Ross*, 396 F. Supp. 3d 1, 11 (D.D.C. 2019), which it describes as holding "that the agency's faulty SPR analysis required vacatur of the listing decision and [not granting] the agency's request for a limited remand to reconsider the SPR analysis."  Opp'n at 19.  But in that case, all parties agreed that the challenged decision turned on a policy that had since been vacated.  396 F. Supp. 3d at 9–10.  The agency asked for a limited remand not for the purpose of reconsidering its decision, but rather to offer a bolstered defense of the decision that would rely on an alternative rationale rather than on the vacated policy.  *Id.* at 10.  The court rejected this proposal because it found, contrary to the agency's argument, that the alternative rationale was not included in the original decision, so was "an impermissible *post hoc* rationalization."  *Id.*  The court did not conduct an *Allied-Signal* analysis regarding the propriety of vacatur; nor was it confronted with an agency request to conduct in the first instance an analysis it had not conducted based on applicable policy at the time of its decision.  Friends of Animals also relies on several other cases that are not apposite because they involved vacatur after a merits determination or agency concessions of error.  *See* Opp'n at 19–20 (first citing *Sierra Club v. EPA*, 705 F.3d 458, 460 (D.C. Cir. 2013), then citing *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008), and then citing *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017)).

As for the second *Allied-Signal* factor, the disruptive consequences of a vacatur, the parties rehash their debate about the risks to the Northern DPS under the Section 4(d) rule. Mem. at 20; Opp'n at 17; Reply at 9–11.  But as the Court has explained, the Northern DPS enjoys substantial protection even under the status quo.  FWS also argues that vacatur would risk confusion to regulated parties and impose a "regulatory see-saw effect" if the Court were to vacate the Section 4(d) rule only for FWS to reinstate it after renewed SPR analysis.  Mem. at 20; Reply at 11.  But FWS describes this harm at a very general level and does not provide any explanation of the compliance costs regulated parties might sustain.  The parties' presentations on the second *Allied-Signal* factor do not provide a basis for concluding that it weighs one way or the other.  Neither factor weighs in favor of vacatur, so the Court will not vacate the Section 4(d) rule.

### C.  Scheduling and Disposition

The parties dispute the schedule that should govern the remand, as well as the appropriate disposition of this action during the remand.  To start with the schedule, FWS proposes that it complete the remanded SPR analysis (including solicitation of public comment) and determine whether it should uplist the Northern DPS to endangered and notify the public by March 28, 2023, and if it concludes that it should, publish for comment a proposed rule uplisting the species by March 28, 2024.  Frazer Decl. ¶¶ 19–21.  In support of this proposal, the Assistant Director for Ecological Services at FWS provides a detailed declaration explaining FWS's limited resources, the time required for each step in the process, and how the FWS proposes to balance a remand against competing priorities, including extending protections to species that are at greater risk than the Northern DPS.  *See id.* ¶¶ 13, 19–21.  Friends of Animals does not dispute any of these representations, but says that it would be more reasonable to order a period of ninety days

18

for FWS to conduct the SPR analysis, followed by the publication of a proposed uplisting rule within ninety days thereafter.  *See* Opp'n at 23–24.

Of the two competing proposals, FWS's is more reasonable.  As a benchmark for evaluating the proposals, the Court looks to the ESA, which sets out a detailed schedule that governs FWS action on petitions to list a species in the first instance.  This includes ninety days to find whether the requested listing action "may be warranted"; twelve months to decide whether the requested listing action is warranted, unwarranted, or is warranted but precluded by competing priorities and, if warranted, prompt publication of a proposed rule taking the requested action; and then twelve months to make a final listing decision after a notice and comment process.  Compl. ¶¶ 30–49 (collecting statutory citations); Mem. at 2–3 (same).  By the Court's calculation, a hypothetical successful Friends of Animals petition for listing in the first instance of the Northern DPS filed on the date of this opinion would result in listing roughly by late 2024 or early 2025—not too much earlier (if at all) than any uplisting decision that would occur under FWS's proposal to propose any rule recommending uplisting by March 28, 2024. By contrast, Friends of Animals's proposed schedule sets the conclusion of FWS's SPR analysis a full year earlier (winter 2022) than its analog on the hypothetical petition timeline, the "twelve-month finding" that the petitioned action is warranted (winter 2023).  Friends of Animals's suggestion for the publication of a proposed uplisting rule (spring 2023) would also require action well in advance of the proposed rule date that would obtain under the hypothetical initial petition schedule (winter 2023).  To be sure, this comparison is not precise; FWS presumably has less work to do for the limited SPR remand than would be required to decide whether to list a species in the first instance.  But the statutory first-instance petition schedule still provides some

insight into the typical timeline for listing determinations and indicates that FWS's proposal is at least reasonable.

Even setting this comparison aside, the Court is not persuaded by either of the arguments Friends of Animals submits in support of its contention that FWS's proposed schedule is unreasonable.  First, Friends of Animals makes much of the fact that FWS previously offered to complete its SPR reconsideration analysis within ten months.[8]  Decl. of Stephen R. Hernick ¶ 7, ECF No. 19-1.  But FWS's schedule provides for completion of this step by March 28, 2023— *less* than ten months from now.  Second, Friends of Animals points to two cases in which courts ordered FWS to undertake analysis in "far shorter timeframes."  Opp'n at 20.  Friends of Animals does not explain why the FWS undertakings in these cases demanded similar time and resource requirements to the SPR remand, and indeed they did not.  In *Ctr. for Biological Diversity v. Norton*, 163 F. Supp. 2d 1297, 1301 (D.N.M. 2001), FWS proposed a period of three months to complete a twelve-month finding, and the court reduced this period to thirty days because FWS merely needed to supplement a finding that it had already drafted.  And in *W. Watersheds Project v. Foss*, No. CV 04 168, 2006 WL 2868846, at *4 (D. Idaho Oct. 5, 2006), "over a year" had passed since the court had first ordered FWS to issue a final listing determination, so the court ordered FWS to issue it within 30 days.  Here, FWS needs to conduct an SPR analysis from the ground up and balance competing resource demands.  The Court finds FWS's explanation for its proposed schedule to be reasonable, and Friends of Animals has not undermined it.

---

[8] FWS complains that this offer, apparently relayed during settlement talks, is inadmissible under Federal Rule of Evidence 408.  Reply at 13.  In any event, the statement does not further Friends of Animals's case.

One other matter remains for resolution: the disposition of this case during the remand. FWS briefly says, without explanation, that the case should be dismissed. Mem. at 22. Friends of Animals suggests that the Court should retain jurisdiction so that it can supervise compliance with the remand schedule and so that Friends of Animals will not have to refile any claims that remain live after the remand. *See* Opp'n at 22–23.

Friends of Animals has the better proposal on this point. Though the Court is confident that the equities weigh in favor of remand without vacatur, it is not blind to the fact that this outcome leaves Friends of Animals with something like the short end of the stick. FWS has committed to reconsidering, but not to changing, the outcome of the Threatened Finding, and it has not committed to any reconsideration of the Section 4(d) rule on its own terms. FWS may uplist the Northern DPS to endangered, which would render the Section 4(d) rule inapplicable and obviate the need to litigate Friends of Animals's challenge to it. This is why the remand presents the potential to conserve judicial resources. But there is a real chance that the outcome of the remand is affirmation of the Threatened Finding and leaving of the Section 4(d) rule in place. In such a circumstance, the Section 4(d) rule will be subject to the same claims Friends of Animals now brings against it.[9] It would make little sense to force plaintiffs to refile these claims at that point. Accordingly, the Court will retain jurisdiction over this case and order FWS to proceed with the remand according to its proposed schedule. *See Clark v. Perdue*, No. CV 19-394, 2019 WL 2476614, at *4 (D.D.C. June 13, 2019). Additionally, because Friends of Animals's opportunity to challenge the Section 4(d) rule will have been substantially delayed in the event FWS declines to uplist, the Court orders that on or before April 3rd, 2023, the parties

---

[9] If the post-remand administrative record alters Friends of Animals's position regarding these claims in some way, the Court will be amenable to a motion for leave to file an amended complaint.

shall meet and confer and shall file a joint status report updating the Court on the outcome of the remand SPR analysis and whether it will result in a proposed uplisting of the Northern DPS to endangered.  If it will not, the joint status report shall propose an expedited briefing schedule for summary judgment on Friends of Animals's remaining claims.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Voluntary Remand Without Vacatur (ECF No. 17) is **GRANTED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  08/29/2022                                              RUDOLPH CONTRERAS
                                                                United States District Judge