**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF ANIMALS,<br>777 Post Road, Suite 205<br>Darien, CT 06820<br><br>    Plaintiff,<br><br>v.<br><br>MARTHA WILLIAMS, in her official capacity as<br>Principal Deputy Director,<br>U.S. Fish and Wildlife Service<br>1849 C Street, NW – MIB Room 3148<br>Washington, D.C. 20240; and<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States,<br>5275 Leesburg Pike<br>Falls Church, VA 22041<br><br>    Defendants. | Case No. 1:21-cv-02081-RC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

~~COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF~~

**INTRODUCTION**

1.    In 2012, the U.S. Fish and Wildlife Service (FWS) used the best available evidence and correctly decided to list as endangered the Northern distinct population segment (DPS) of the southern subspecies of the Scarlet Macaw (*A.m. macao*) (hereinafter, "Northern DPS").

2.    A few years later in 2016, FWS threw logic and the best available evidence out the door and abruptly changed its decision to list the Northern DPS of the scarlet macaw from endangered to threatened. FWS finalized that decision in 2019. FWS used the same evidence in the final threated finding in 2019 as it did in its 2012 endangered finding. The only additional sources FWS relied on in its 2019 threatened finding (hereinafter,

1

"Threatened Finding") were a few anecdotal observations and absolutely no additional peer-reviewed evidence.

3.      The beautiful scarlet macaw, rainbow in color with a wingspan of up to one meter, is being hunted down in Central and South America by poachers. The poachers sell the scarlet macaw for as much as $5,000 to people who domesticate the bird and lock it in a cage. Additionally, climate change and deforestation are threatening the habitat of the largely decreasing populations of the scarlet macaw.

4.      The Endangered Species Act (ESA) requires FWS to protect at-risk species from extinction. With only 25 remaining scarlet macaws in Panama, it is quite apparent the species is at risk.

5.      FWS changed the proposal to list the Northern DPS as endangered despite no new information that would justify changing the listing. And it changed its determination despite overwhelming evidence that the Northern DPS is in danger of extinction due to several threats, including ongoing habitat destruction, poaching, and inadequate regulations. The Threatened Finding also includes a special Section 4(d) rule that fails to provide for the conservation of the species.

6.      Finally, FWS's reversal of its position is not rationally connected to the best available scientific data because the only new information FWS relied on to downlist the Northern DPS as threatened is from eBird, an online database open to anyone in the public, regardless of his or her qualifications, experience, or credibility, to upload pictures of birds.

7.      FWS's determination and reversal of its former position violated the ESA and is arbitrary, capricious, and contrary to the law within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Defendants' failure to fulfill their duties under the ESA places the Northern DPS of the scarlet macaw in further peril, subjecting them to human exploitation and potential extinction.

8.    In making the Threatened Finding, Defendants ignored the plain language of the ESA, which requires that a species be listed as endangered if it is sufficiently threatened by *any* of the five factors identified in the ESA.

9.    In making the Threatened Finding, Defendants applied an arbitrary evidentiary standard in violation of the ESA.

9.10.    In 2023, Defendants reaffirmed the Threatened Finding after analyzing whether the Northern DPS was endangered in a significant portion of its range and erred in finding that it was not, despite finding that the Northern DPS is in danger of extinction in Panama and Colombia.

10.11.    Defendants promulgated a rule pursuant to Section 4(d) of the ESA that permits the import and export of certain Northern DPS species into and from the United States and permits certain acts in interstate commerce without a permit. This undermines protections provided by listing the species. Despite recognizing the inability to distinguish the Northern DPS from the endangered northern subspecies, the 4(d) rule irrationally provides less protection for the southern subspecies, including the Northern DPS of the southern subspecies.

11.12.    The 4(d) rule fails to meet the ESA's mandate to provide those measures "necessary and advisable" for the conservation of the species and is arbitrary and capricious. FWS also failed to ensure that the 4(d) rule will not cause jeopardy to the species by diminishing the likelihood of survival and recovery.

12.13.    To remedy the Defendants' violations of the law, Friends of Animals respectfully requests declaratory and injunctive relief remanding the Threatened Finding for further consideration of whether the species should be listed as endangered.

### JURISDICTION AND VENUE

13.14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (U.S. as a defendant), 28 U.S.C. §§ 2201-2202

(declaratory and injunctive relief), 16 U.S.C. § 1540(c) and (g) (action arising under the ESA and citizen-suit provision), and the APA, 5 U.S.C. §§ 701-706.

14.15. This Court has authority to grant Plaintiff's requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), 5 U.S.C. §§ 701-706 (APA), and 16 U.S.C. § 1540(g) (ESA).

15.16. Pursuant to the ESA's citizen-suit provision, Friends of Animals sent Defendants notice of its intent to sue (the "Notice") on March 24, 2020. *See* 16 U.S.C. § 1540(g)(2).

16.17. Defendants received the Notice on March 30, 2020.

17.18. More than 60 days have passed since Defendants received the Notice.

18.19. Defendants have not remedied the violations of the ESA. Therefore, an actual controversy exists between the parties. *See id.*

19.20. Venue is proper in this Court pursuant to the ESA, 16 U.S.C. § 1540(g)(3)(A), and 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendants maintain offices within this district.

## PARTIES

20.21. Plaintiff, FRIENDS OF ANIMALS, sues on behalf of itself and its adversely affected members. Friends of Animals is a not-for-profit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine called *ActionLine*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of species so that they can live unfettered in their natural habitats.

4

21.22. In the absence of proper protection under the ESA, the Northern DPS is subject to mounting pressures from habitat destruction and rampant poaching. Friends of Animals' members and staff are injured by Defendants' failure to list the Northern DPS as endangered under the ESA.

22.23. Plaintiff has invested time and resources to protect the scarlet macaw, including advocating for the conservation of the species, and for listing the scarlet macaw as endangered under the ESA. In addition, Plaintiff has worked to educate its members and the public about the status of the species and threats it faces.

23.24. Plaintiff has members who live near and visit habitat of the Northern DPS of scarlet macaws. These members search for, observe, and photograph the Northern DPS. They derive scientific, recreational, educational, conservation, and aesthetic benefits from the existence, observation, and study of scarlet macaws, including the Northern DPS.

24.25. The aesthetic, recreational, scientific, educational, and other interests of Friend of Animals and its members have been, are being, and, unless the relief requested is granted, will continue to be, adversely and irreparably injured by Defendants' Threatened Finding and refusal to list the Northern DPS as endangered under the ESA. These are actual, concrete injuries to Friends of Animals and its members, caused by Defendants' failure to comply with the ESA and its implementing regulations and policies. These injuries would be redressed by the relief requested in this Complaint.

25.26. Defendant, MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of FWS, an agency within the U.S. Department of the Interior, is responsible for the implementation of the ESA with respect to threatened or endangered terrestrial species such as the Northern DPS of the scarlet macaw. The Principal Deputy Director is also responsible for actions of her delegate, FWS, including the delegate's Threatened Finding. Defendant Williams is sued in her official capacity.

26.27. Defendant, U.S. FISH AND WILDLIFE SERVICE, is an agency of the United States within the Department of the Interior. FWS is responsible for complying with all federal laws, including the ESA.[1] FWS is responsible for implementing and administering the ESA with respect to terrestrial wildlife such as the Northern DPS of the scarlet macaw.

**STATUTORY AND REGULATORY FRAMEWORK: THE ENDANGERED SPECIES ACT**

27.28. The purpose of the ESA is to conserve endangered and threatened species and the ecosystems upon which these species depend. 16 U.S.C. § 1531(b).

28.29. The listing process is the essential first step in the ESA's system of species protection and recovery. Before the ESA can protect a species facing extinction or that species' habitat, the species must be listed as either endangered or threatened. 16 U.S.C. § 1533(d).

29.30. A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is threatened if it is "likely to become an endangered species within the foreseeable future." 16 U.S.C. § 1532(20).

30.31. FWS must list a species if it is threatened or endangered due to any one or a combination of the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

31.32. FWS's decision whether to list a species is limited solely to consideration of these five factors. In considering these factors, FWS must use only "the best available scientific and commercial information regarding a species' status, without reference to

---

[1] Hereinafter the term "FWS" shall be used to refer to the Principal Deputy Director of Fish and Wildlife Service and the Fish and Wildlife Service, collectively.

possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b)[2], 16 U.S.C. § 1533(b)(1)(A).

32.33. The ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

33.34. Under the ESA, FWS may list a vulnerable distinct population segment (DPS) of vertebrate species for protection, even if the species, as a whole, may not be considered threatened or endangered. The independent listing of a DPS is intended to be a preemptive measure to "protect and conserve species and the ecosystems upon which they depend before largescale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

34.35. FWS's decisions to designate a DPS under the ESA are guided by the joint policy ("DPS Policy") adopted by FWS and the National Marine Fisheries Service in 1996. *Id.*

35.36. The DPS Policy sets forth three elements that are considered in the decision regarding the possible status of a DPS as endangered or threatened:

(1)    Discreteness of the population segment in relation to the remainder of the species to which it belongs;
(2)    The significance of the population segment to the species to which it belongs; and
(3)    The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

61 Fed. Reg, 4725 (Feb. 7, 1996).

36.37. FWS can treat any species as endangered or threatened based on similarity of appearance. 16 U.S.C. § 1533(e).

---

[2] FWS issued amended regulations after it issued the Threatened Finding. However, those regulations do not have retroactive effect and thus do not apply. 84 Fed. Reg. 45020 (changes to regulations "will apply only to relevant rulemakings for which the proposed rule is published after [September 26, 2019]"). Regulations referenced in this Complaint are to the regulations in effect at the time the Threatened Finding was issued.

37.38. In determining whether to treat a species as endangered or threatened due to similarity of appearance, FWS must consider

(1) The degree of difficulty enforcement personnel would have in distinguishing the species, at the point in question, from an Endangered or Threatened species (including those cases where the criteria for recognition of a species are based on geographical boundaries);

(2) The additional threat posed to the Endangered or Threatened species by the loss of control occasioned because of the similarity of appearance; and

(3) The probability that so designating a similar species will substantially facilitate enforcement and further the purposes and policy of the Act.

50 C.F.R. § 17.50.

38.39. Any interested person may begin the listing process by filing a petition to list a species with FWS. 16 U.S.C. § 1533(b)(3)(A).

39.40. Upon receipt of a petition to list a species, FWS is required to make an initial finding known as a "90-day finding" on whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.*

40.41. If FWS finds that the petition does not present substantial information indicating that the listing may be warranted, the petition is rejected, and the process ends. This is known as a "negative" 90-day finding. This finding is subject to judicial review in federal court. *See* 16 U.S.C. § 1540(c), (g).

41.42. If FWS finds that the petition presents substantial information indicating that listing may be warranted, FWS must then commence a status review of the species. 16 U.S.C. § 1533(b)(3)(B). This is known as a "positive" 90-day finding. 16 U.S.C. § 1533(b)(3)(A).

42.43. If a positive 90-day finding is made, FWS has twelve months from the date the petition was received to make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted, but presently precluded by other pending proposals to list species of higher priority, provided that FWS is making expeditious progress in listing other species. 16 U.S.C. §

1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3). This second finding is known as a "twelve-month finding."

43.44. FWS must ultimately list the species under the ESA if it determines that the species is endangered or threatened because of any one or a combination of the five listing factors. 50 C.F.R. § 424.11(c).

44.45. A species is "endangered" if it is "in danger of extinction throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6) (emphasis added).

45.46. FWS must base its decision whether to list the species solely on the best available scientific and commercial data. 16 U.S.C. § 1533(b).

46.47. The information relied on for the final listing decision should be peer-reviewed. 59 Fed. Reg. 34270 (July 1, 1994).

47.48. The decision whether to list a species is subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii).

48.49. If FWS finds the listing of the species is warranted, it must publish a proposed rule for public comment to list such species as either endangered or threatened in the Federal Register. 16 U.S.C. § 1533(b)(5).

49.50. The final listing decision for the species must be made within one year of the publication of a proposed rule to list a species. 16 U.S.C. § 1533(b)(6)(A).

50.51. Once a species is listed, the ESA provides strong legal protection to encourage the species' recovery. The ESA requires FWS to designate critical habitat for all threatened and endangered species concurrently with their listing and subsequently develop recovery plans for such species. 16 U.S.C. § 1533(a)(3), (f).

51.52. The ESA also requires that all federal agencies "carry out programs for the conservation" of threatened and endangered species and consult with the Secretary in order to ensure that their actions are "not likely to jeopardize the continued existence" of

such species or "result in the destruction or adverse modification" of their critical habitat. 16 U.S.C. § 1536(a)(1)-(2).

52.53. The ESA automatically confers certain mandatory statutory protections on species that are listed as endangered, whereas protections for threatened species must be promulgated by FWS through regulation. For species listed as endangered, the ESA makes it unlawful for anyone to take, trade, or sell any such species. 16 U.S.C. § 1538(a)(1).

53.54. For species listed as threatened, the ESA provides that

> [T]he Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species.

16 U.S.C. § 1533(d).

54.55. Pursuant to Section 4(d), FWS issued regulations extending the prohibition on take to all threatened species two years after the enactment of the ESA. *See* 50 C.F.R. § 17.31(a); 40 Fed. Reg. 44412, 44414 (Sept. 26, 1975). This applied to all species unless FWS promulgated a "special rule" for the threatened species per Section 4(d) ("blanket 4(d) rule"). 50 C.F.R. § 17.31(c); 40 Fed. Reg. 44412, 44414 (Sept. 26, 1975).

55.56. In 2019, FWS issued new regulations that removed this blanket protection for newly listed species. However, the rule still applies to threatened species listed before September 26, 2019. 50 C.F.R. § 17.31(a).

56.57. Under the ESA, FWS is required to carry out the provisions and enforcement of the Convention on International Trade in Endangered Species of Wild Flora and Fauna (CITES).

57.58. CITES is a multilateral treaty to which the U.S. is Party. Under CITES, each Party must designate a Management Authority, or Authorities, to be in charge of the licensing system that monitors the import, export, and re-export of species.

58.59. The Scientific Authority, or Authorities, must be in place to advise the Management on the impacts of the trade of species and appropriate categorization under the CITES Appendices.

59.60. There are three Appendices under CITES.

60.61. Appendix I includes all species threatened with extinction and who can be traded in only rare circumstances.

61.62. Appendix II includes species that are protected in at least one country and requires the approval of the Management Authority, and often the Scientific Authority, before trade is permitted.

62.63. Appendix III governs species that a particular Party has listed as protected and seeks assistance from other Parties to help control the trade of the particular species.

## FACTUAL BACKGROUND

### A. The Scarlet Macaw

63.64. The scarlet macaw is a large neotropical parrot species, with an average length of 89 centimeters.

64.65. The scarlet macaw primarily inhabits tropical humid evergreen forests, as well as some other forest types, forages primarily in developed forest canopy, and nests in pre-existing tree cavities as far above the ground as possible. Nests are generally 13 to 30 meters above the ground.

65.66. Scarlet macaws live long lives, up to 50 years in the wild.

66.67. Scarlet macaws mature slowly and, because of their small clutch sizes, generally breed only once per year and have one clutch per year.

67.68. Scarlet macaws do not begin breeding until 4-7 years old and will stop by the age of 25.

68.69. The survival rate for the young of the scarlet macaw is very low.

11

69.70. Scarlet macaws, due to their size, require large nest cavities in trees. The nests must also be isolated from predators and near vegetation for food sources.

70.71. The Northern DPS's range consists of mainland Panama, northwest Colombia, and the Central Pacific Conservation Area (ACOPAC) and the Osa Conservation Area (ACOSA) of southwestern Costa Rica.

**B.  Threats to the Northern DPS**

71.72. The Northern DPS faces threats from habitat destruction due to deforestation and forest degradation, overutilization as a result of poaching for the pet trade, inadequate regulatory mechanisms to protect its habitat, and danger from a small and fragmented population size.

72.73. Scarlet macaws are particularly vulnerable to population loss due to their slow reproductive rates.

73.74. Scarlet macaws are hunted for feathers and meat. Throughout the world, including in the United States, Indigenous peoples use the feathers of the scarlet macaw for ceremonial purposes.

74.75. Disease and predation pose direct threats to scarlet macaw populations.

75.76. Due to the slow reproductive rate of the scarlet macaw, the capture and poaching of the scarlet macaw for the pet trade is devastating to the species' population.

76.77. Poachers destroy trees with nest cavities in the process of poaching scarlet macaws; the destruction of the trees then limits breeding areas for the remaining birds.

**C.  The Endangered 12-Month Finding in 2012**

77.78. On January 29, 2008, Friends of Animals submitted a petition to FWS to list the scarlet macaw and 13 other parrot species under the ESA.

78.79. On July 14, 2009, FWS published a 90-day finding pursuant to 16 U.S.C. § 1533(b)(3)(A) with its determination that Friends of Animals' petition to list the 14 parrot

species presented substantial scientific and commercial information indicating that the petitioned action may be warranted.

79.80. On July 6, 2012, FWS published a 12-month finding determining that the scarlet macaw subspecies *A. m. cyanoptera* and Northern DPS both warranted an endangered listing (the "Endangered Finding").

80.81. In determining that the Northern DPS qualified as a DPS, FWS found that the loss of the Northern DPS would result in the extinction of the population segment in Central America and a loss of the connection between the northern and southern subspecies of the scarlet macaw.

81.82. FWS estimated that the population of scarlet macaws in Panama was less than two hundred.

82.83. In determining that the Northern DPS warranted an endangered listing, FWS principally cited large declines in population due to four factors: (1) habitat loss; (2) poaching; (3) ongoing habitat loss and poaching; and (4) inadequate regulations in place to end threats.

83.84. Deforestation and forest degradation, due in part to lack of forest management, pose indirect threats to scarlet macaws, according to FWS.

84.85. FWS also noted that macaws are extremely vulnerable to various factors due to their small population size.

85.86. FWS recognized that scarlet macaws face deforestation in most of Mesoamerica. Without proper habitats, mainly large trees to support nest sites, scarlet macaw populations will continue to decline.

86.87. FWS concluded that deforestation was an immediate threat in Panama and that the scarlet macaw was in danger of extinction there.

87.88. FWS reported that Coiba Island, Panama, where the majority of the scarlet macaws in Panama live, is now experiencing deforestation because of the cattle industry.

13

88.89. FWS found that scarlet macaws have been eliminated from 80% of their range in Costa Rica due to habitat loss.

89.90. FWS stated there are only approximately 800 to 2,000 scarlet macaws in the ACOSA region of Costa Rica.

90.91. FWS noted that the Amazon rainforest, a portion of which is located in the scarlet macaws' range in Colombia, has the world's highest rate of deforestation.

91.92. FWS stated deforestation is ongoing, and approximately 40% of forests in protected areas and 85% of forests in non-protected areas may be wiped out.

92.93. In 2011, the International Union for Conservation of Nature (IUCN) proposed reclassifying the scarlet macaw from "Least Concerned" to "Threatened," acknowledging the decline in the Northern DPS due to habitat loss from deforestation.

93.94. FWS reported Colombia does not have specific national forest laws in place to help with sustainable forest management.

94.95. FWS observed that parrot species, including the scarlet macaw, are significantly threatened due to poaching for the pet trade.

95.96. FWS detailed the taking of chicks from nests and the trapping of adult scarlet macaws by poachers to sell and export. Up to 77% of the captured scarlet macaws die from the capture and transport.

96.97. FWS noted scarlet macaws can be purchased illegally for up to $2,000.

97.98. This high price is attributable to the bird's rarity; the rarer and more exotic a bird is, the higher price a poacher will receive.

98.99. CITES Appendix I lists the scarlet macaw.

99.100. FWS stated that poaching of one of two viable populations in Costa Rica is on the rise and that there are reports of a significant number of nests being poached.

100.101. FWS found that poaching had reached unsustainable levels in Costa Rica and concluded that poaching was a significant threat to macaws in Costa Rica.

101.102.    FWS provided evidence that poaching of the scarlet macaw in Costa Rica is a major threat to the species.

102.103.    FWS found that the poaching of even one scarlet macaw in Panama will have a negative impact on the population because the population of scarlet macaws in Panama is so low.

103.104.    FWS found poaching to be a significant threat to the scarlet macaw in Panama.

104.105.    FWS stated there are "adequate" provisions in place (national or subnational policy framework on forest management) for countries where the scarlet macaw is located. However, FWS also noted that forest degradation and deforestation are still occurring at levels to negatively impact scarlet macaw populations in Panama.

105.106.    FWS concluded that poaching of the scarlet macaw for the pet trade is a threat and that the capture of the scarlet macaw is negatively impacting the Northern DPS in Costa Rica and Panama.

106.107.    FWS concluded that current regulations regarding overutilization of the scarlet macaw for commercial, recreational, scientific, or educational purposes are inadequate. The inadequate regulations pose a significant and immediate threat to the Northern DPS.

107.108.    FWS reported small, isolated population sizes of the scarlet macaw are at greater risk of becoming extinct.

108.109.    Small, isolated, declining species populations are more vulnerable to habitat loss. The populations need to be at a "minimal viable population" size to avoid extinction.

109.110.    FWS provided evidence showing a typical "minimal viable population" size ranges from 1,000 to 7,000 adults of a given species.

110.111.    FWS stated that the Costa Rican Northern DPS population was relatively small and isolated.

111.112.    Overall, FWS found it was reasonable to determine that scarlet macaws in Mesoamerica were endangered by the synergistic interaction between small population size and other threats.

**D. The Challenged Threatened Finding**

112.113.    On April 7, 2016, FWS published a proposed rule to modify the proposed listing of the Northern DPS population of the scarlet macaw from endangered to threatened.

113.114.    FWS claimed the 2016 modification stemmed from new information. The 2016 proposed rule affirmed the established boundary, the Andes Mountains, between the Northern and Southern DPS of the scarlet macaw.

114.115.    FWS stated in the revised proposal that it is difficult to determine by sight alone if a scarlet macaw belongs to the northern or southern subspecies. FWS noted it would be far too costly to identify the birds through genetic analysis.

115.116.    FWS chose not to list the southern subspecies, including the Northern DPS, as endangered, despite the similarity of appearance to the endangered northern subspecies.

116.117.    On February 26, 2019, FWS published notice of its decision to list the Northern DPS as threatened. Endangered and Threatened Wildlife and Plants; Listing the Scarlet Macaw, 84 Fed. Reg. 6278 (Feb. 26, 2019).

117.118.    FWS's new decision not to list the Northern DPS as endangered was arbitrary and capricious, and violated the requirements of the ESA and corresponding regulations.

118.119.    FWS did not adequately explain its decision to list the Northern DPS as threatened instead of endangered.

119.120.    In changing its proposal to list the Northern DPS as threatened instead of endangered, FWS failed to adequately consider whether the Northern DPS is endangered in a significant portion of its range.

120.121.    FWS relied on anecdotal sightings, vague population estimates that lack cited data, and unsupported conclusions regarding deforestation in the Northern DPS's range.

121.122.    FWS failed to make its determination "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533 (b)(1)(A).

122.123.    A portion of the claimed "new data" used by FWS to make the Threatened Finding is from eBird.

123.124.    eBird is an online database of bird observations for scientists, researchers, and amateur birdwatchers.

124.125.    eBird submissions are not peer-reviewed.

125.126.    eBird submissions are not verified, although the Cornell Lab of Ornithology manages the online database.

126.127.    Any person can upload data to the eBird database, regardless of their qualifications.

127.128.    According to a Department of the Interior press release on March 24, 2021, FWS and eBird have formed a partnership and are working together on a project about bald eagle populations.

128.129.    The Threatened Finding mentions eBird on three separate occasions: (1) FWS stated it took "relevant information from eBird" to make the Threatened Finding; (2) bird observers in Mexico did not report observing scarlet macaws in a "high-quality habitat"; and (3) FWS stated some eBird observers reported sightings of scarlet macaws in Costa Rica.

17

129.130.    eBird does not differentiate between the Northern and Southern DPS of scarlet macaws.

130.131.    The primary sources FWS cited in the 2012 12 MonthEndangered Finding are also the primary sources cited in the Threatened Finding.

131.132.    FWS failed to provide additional sources or factual information that indicate why the agency changed its decision from listing the Northern DPS population as endangered to threatened.

132.133.    The sources cited in the 2012 12 MonthEndangered Finding led FWS to determine the Northern DPS population is endangered due to factors such as deforestation and poaching. The Threatened Finding sources did not provide evidence to account for FWS's decision to downlist the Northern DPS as threatened.

133.134.    FWS failed to cite any source to support its decision to no longer list the Northern DPS population as endangered.

134.135.    FWS stated the Costa Rican Northern DPS population remains low, at an estimated 1,800 birds. This number is on the smaller side of the "minimal viable population" range needed for a species to avoid extinction.

135.136.    FWS also relied on statements from residents in Costa Rica who said they believed the scarlet macaw population was more abundant in 2005 than in 2000. These statements were also before FWS when it found that listing the Northern DPS as endangered was warranted.

136.137.    In the Threatened Finding, FWS stated it believed the Northern DPS in Costa Rica is becoming "stable or increasing."

137.138.    This statement about the Northern DPS in Costa Rica becoming "stable or increasing" was given with minimal new evidence. The only new evidence relied upon is eBird.

18

138.139.      FWS found that there are only about twenty-five scarlet macaws in Panama.

139.140.      FWS failed to adequately explain its position that deforestation is not an immediate threat to scarlet macaws in Panama.

140.141.      FWS relied on an outdated source to conclude that deforestation in Panama only takes place outside the scarlet macaw's range, despite admitting that it has little information on the current scope and extent of deforestation on Panama's mainland.

141.142.      FWS failed to adequately explain its position that the Northern DPS is not endangered despite its own findings that unregulated deforestation in Colombia endangers the Northern DPS there and that scarlet macaws have been virtually extirpated from vast regions of their range in northwest Colombia.

142.143.      FWS claimed it has very little information on the size of the Northern DPS population in Colombia.

143.144.      The Northern DPS population is reported as likely close to extinction in several areas of Colombia, including the Magdalena Valley.

144.145.      FWS recognizes that "small population size is a contributing stressor to scarlet macaws . . . [on] the range of *A. m. macao* in Costa Rica, Panama, and northwest Colombia."

145.146.      In the initial Threatened Finding, FWS failed to separately consider whether the Northern DPS is endangered in a significant portion of its range, even if it is not endangered throughout its entire range.

146.147.      In 2012, FWS admitted there is little information on the extent of deforestation in Panama, but in the 2019 Threatened Finding, FWS stated deforestation is not an issue in Panama.

147.148.      FWS failed to explain why it changed its position on the Northern DPS in Panama without any new information.

148.149.    FWS failed to acknowledge the significant harm that poaching of scarlet macaw chicks and adults has on the Northern DPS.

149.150.    FWS failed to explain the change in its position on the poaching of the Northern DPS in Costa Rica.

150.151.    In the 2012 12-MonthEndangered Finding, FWS found that the cumulative effects of threats warranted listing the Northern DPS as endangered.

151.152.    Overall, FWS did not support its claims that "new information" led to the decision to list the Northern DPS as threatened, rather than endangered.

152.153.    The vast majority of sources, studies, and data used by FWS remained consistent from the 2012 12-MonthEndangered Finding to the 2019 Threatened Finding.

154.    The only new sources that FWS considered in the 2019 Threatened Finding that it did not consider in making the 2012 12-MonthEndangered Finding are anecdotal, non-peer-reviewed observations.

**E.  Significant Portion of Its Range Analysis**

155.    When it made the Endangered Finding in 2012, FWS did not analyze whether the Northern DPS was endangered in a significant portion of its range (an "SPR Analysis").

156.    An SPR Analysis was unnecessary because FWS had found the Northern DPS to be endangered throughout all of its range.

157.    When it made the Threatened Finding in 2019, FWS did not conduct an SPR Analysis of the Northern DPS.

158.    The plain language of the ESA required FWS to conduct an SPR Analysis before issuing the Threatened Finding.

159.    Pursuant to a voluntary remand from this lawsuit, FWS for the first time undertook an SPR Analysis for the Northern DPS.

160.    On November 2, 2022, FWS published a notice in the Federal Register titled "Possible Effects of Court Decision on Significant Portion of the Range Analysis for the

20

Northern Distinct Population Segment of the Southern Subspecies of Scarlet Macaw" (the "SPR Notice").

161.    In the SPR Notice, FWS requested public comments "on the manner in which the plain language of the Act and *CBD v. Everson* may affect our February 26, 2019 final rule . . . . Specifically, we are interested in public input on whether and how the *CBD v. Everson* opinion affects the SPR analysis in the threatened determination."

162.    The SPR Notice clarified that FWS wanted public comments "that pertain to the issues raised in the preceding paragraph only."

163.    On April 3, 2023, FWS published a notice in the Federal Register with the results of its SPR Analysis (the "SPR Finding").

164.    In the SPR Finding, in responding to a 2019 study that Friends of Animals had asked FWS to consider in its analysis, FWS noted that it had "requested public comments only on how recent case law" relating to an SPR analysis could affect the 2019 Threatened Finding and concluded that "[a]ny public comment that is beyond the scope of our request is not relevant."

165.    In the SPR Finding, FWS agreed with Friends of Animals that it must list the entire Northern DPS as endangered if it is endangered in a significant portion of its range.

166.    In the SPR Finding, FWS concluded that it was not aware of information on the movement of migration of the Northern DPS between Costa Rica and Panama, Panama and Colombia, or Costa Rica and Colombia.

167.    In its SPR Finding, FWS found that the Northern DPS is not currently in danger of extinction in Costa Rica.

168.    In its SPR Finding, FWS found that the Northern DPS is in danger of extinction in both Panama and Colombia.

169.    Because FWS found that the Northern DPS is in danger of extinction in Panama and Colombia, it also considered whether Panama and Colombia, either on their own or in combination, constitute a significant portion of the Northern DPS's range.

170.    FWS concluded that neither Panama nor Colombia, either on their own or together, constitute a significant portion of the Northern DPS's range.

171.    FWS indicated that in determining whether a portion is significant, it "considered how the portion contributes to the viability of the species."

172.    FWS noted that there are a number of ways in which a portion of a species' range could contribute to the viability of a species, namely by serving a particular role in the life history of the species, by including high-quality or unique-value habitat for the species, or by representing a large percentage of the species' range.

173.    FWS concluded that the total range of where the Northern DPS occurs in Panama is unknown.

174.    FWS concluded that the total range of where the Northern DPS occurs in Colombia is unknown.

175.    FWS made no attempt to quantify approximately what percentage of the Northern DPS's range is contained within Panama and Colombia.

176.    In its SPR Finding, FWS did not consider whether the Northern DPS's habitats in Panama and Colombia constitute a significant portion of the Northern DPS's range based on their total area.

177.    In the SPR Finding, FWS did consider whether the populations of the Northern DPS in Panama and Colombia constitute a significant portion of its population.

178.    FWS did not consider the value of the Northern DPS's habitat in Panama and Colombia and whether that value is significant.

179.    FWS found that the combined portion of Panama and Colombia is not significant because "the populations are very small, they do not account for a large

22

percentage of the range, and this portion is not biologically or genetically unique from the rest of the northern DPS."

180. FWS did not provide the public with an opportunity to comment on the SPR Finding.

181. In concluding that the Northern DPS is not endangered in a significant portion of its range, FWS failed to rely on the best available science.

182. In Costa Rica, the Northern DPS is found in the ACOPAC and ACOSA conservation areas.

183. ACOPAC consists of an area of roughly 5,625 square kilometers.

184. ACOSA consists of an area of roughly 4,104 square kilometers.

153.185. The portion of the Northern DPS's range in Panama and Colombia combined is larger than the portion of its range in Costa Rica.

## E.F. Special 4(d) Rule

154.186. FWS, when making the 2019 Threatened Finding, established a special rule pursuant to Section 4(d) of the ESA.

155.187. FWS found that poaching for the pet trade is a significant threat to the northern subspecies of scarlet macaws that places the species in danger of extinction.

156.188. FWS found that enforcement personnel would have a substantial difficulty in attempting to differentiate between subspecies of scarlet macaws.

157.189. FWS is not aware of any distinguishing morphological differences between the subspecies that would allow for visual identification of the origin of the bird.

158.190. FWS also found that identification of the different subspecies is difficult because the animals submitted to FWS's Office of Law Enforcement consist of partial remains, detached feathers, and artwork containing their feathers.

159.191. FWS failed to consider whether the similarity of appearance is an additional threat to the northern subspecies.

160.192.     FWS failed to consider whether listing the Northern and Southern DPS of the southern subspecies was warranted because of the southern subspecies' similarity of appearance to the endangered northern subspecies.

161.193.     FWS failed to consider whether listing the southern subspecies as endangered would facilitate enforcement and further the purposes and policy of the ESA.

162.194.     The special 4(d) rule creates a loophole allowing importers or exporters to mispresent that a macaw is from southern subspecies when it is in fact from the northern subspecies.

163.195.     Under the 4(d) rule, importers can still import the Northern DPS with a permit, pursuant to the similarity appearance permit regulations at 50 C.F.R. § 17.52.

164.196.     The 4(d) rule authorizes the import or export of scarlet macaws without an ESA permit if the animal was (1) held in captivity prior to the date the species was listed under the Act; or (2) is a captive-bred specimen.

165.197.     The 4(d) rule allows for the import or export of live and dead scarlet macaws born in captivity that do not fulfill the definition of "bred in captivity" in CITES Resolution Conf. 10.16, as well as parts and derivatives thereof.

166.198.     Animals that do not meet the CITES definition of "bred in captivity" would be those whose parents came from the wild and in a manner that is detrimental to the survival of the species.

167.199.     The 4(d) rule streamlines the permitting process by deferring to existing laws and not requiring permits under the ESA for certain types of activities.

168.200.     The 4(d) rule places no restriction on the trade in interstate commerce of the northern subspecies of scarlet macaws. Under the 4(d) rule, a person may deliver, receive, carry, transport, or ship the Northern and Southern DPS in interstate commerce in the course of commercial activity, or sell or offer to sell the Northern and Southern DPS without an ESA permit.

24

169.201.    The best available data indicates that the current threat of trade of the scarlet macaw reaches beyond domestic markets of Central and South America.

170.202.    Restricting commerce, including interstate commerce, of scarlet macaws is necessary and advisable to provide for the conservation of the Northern DPS and the northern subpopulation of scarlet macaws.

## FIRST CAUSE OF ACTION

**Defendants' Decision to List the Northern DPS as Threatened Rather than Endangered Violates the Endangered Species Act and is Otherwise Arbitrary and Capricious**

171.203.    Plaintiff herein incorporates all information and allegations in the preceding paragraphs.

204.   In issuing and affirming the Threatened Finding, the Defendants (1) did not base the Threatened Finding on the best available scientific evidence; (2) failed to explain how FWS reached a different finding in its Threatened Finding, despite using the same scientific information; (3) violated the ESA by ignoring the requirement of listing a species as endangered if any of the five factors are present; (4) failed to consider or determine whether the Northern DPS is endangered in a significant portion of its range; (45) failed to consider the cumulative effects of threats; and (56) otherwise acted in a manner that was arbitrary, capricious, and contrary to law in violation of the ESA within the meaning of the APA.

172.205.    In issuing the SPR Finding in 2023, the Defendants (1) failed to correct any of the deficiencies listed above; (2) failed to use the best available science in determining whether the Northern DPS was endangered in a significant portion of its range; (3) failed to adequately consider the significance of portions of the range where the Northern DPS is endangered; (4) erred in finding that the Northern DPS is not endangered in a significant portion of its range; and (5) otherwise acted in a manner that was arbitrary, capricious, and contrary to law in violation of the ESA and APA.

**SECOND CAUSE OF ACTION**

**Defendants' Special 4(d) Rule for the Northern DPS of the Scarlet Macaw Violates the Endangered Species Act and the Administrative Procedure Act**

173.206.    Plaintiff herein incorporates all information and allegations in the preceding paragraphs.

207.    In issuing the special 4(d) rule for the Northern DPS, the Defendants (1) failed to meet the requirements of ESA Section 4(d); (2) failed to provide for the conservation of the species; (3) failed to consider the significant harm that will come to the Northern DPS and the endangered northern subspecies if the special 4(d) rule remains in place; and (4) erroneously relied on the arbitrary and capricious conclusions from the Threatened Finding. Thus, the special 4(d) Rule is arbitrary, capricious, and contrary to law in violation of the ESA within the meaning of the APA.

**THIRD CAUSE OF ACTION**
**Defendants Did Not Provide the Public a Meaningful Opportunity to Comment on their SPR Analysis**

208.    Plaintiff herein incorporates all information and allegations in the preceding paragraphs.

209.    Defendants improperly restricted the scope of public comments in 2022 in the SPR Notice.

210.    Defendants failed to solicit public comments regarding whether the Northern DPS is endangered in a significant portion of its range.

211.    Defendants never offered the public an opportunity to comment on the substance of FWS's SPR Finding.

212.    Defendants deprived the public of a meaningful opportunity to comment on the SPR Analysis for the Northern DPS.

174.213.    Defendants' SPR Notice, SPR Analysis, and SPR Finding were arbitrary, capricious, and contrary to law in violation of the ESA and the APA.

26

**REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment providing the following relief:

A. Declare that the Defendants violated the ESA and/or the APA by issuing and affirming the unlawful Threatened Finding rather than listing the Northern DPS scarlet macaw population as endangered;

B. Declare that the Defendants violated the ESA and/or the APA by issuing the special 4(d) Rule;

C. Vacate the special 4(d) rule and order that provisions of 50 C.F.R. § 17.21 apply to the Northern DPS, treating it as though there was no species-specific 4(d) rule when FWS issued the Threatened FindingRule on February 26, 2019;

D. Declare that in issuing the Threatened Finding and SPR Finding, Defendants acted arbitrarily, capriciously, and inconsistently with the ESA;

E. Remand the Threatened Finding;

E.F. Remand the SPR Finding;

F.G. Order the Defendants to review the best scientific data available and reconsider listing the Northern DPS as endangered and issue a new final rule within six months;

G.H. Order FWS to carry out and/or require remedial relief for any harm to the species already caused by the issuance of the Threatened Finding and SPR Finding;

H.I. Award Plaintiff's costs, including reasonable attorney fees pursuant to the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2414; and/or

I.J. Provide Plaintiff such other relief as the Court deems just and proper.

Dated: Aprilugust 73, 202331

27

Respectfully Submitted,

/s/ *Stephen Hernick* ~~*Jennifer Best*~~

Stephen Hernick (DC Bar No. CO0091)

Jennifer Best (DC Bar No. CO0056)

~~Stephen Hernick (DC Bar No. CO0091)~~

Friends of Animals Wildlife Law Program
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Tel: 720.949.7791
Fax: 888.236.3303
shernick@friendsofanimals.org

jennifer@friendsofanimals.org
~~shernick@friendsofanimals.org~~

*Attorneys for Plaintiff*

28