## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| FRIENDS OF ANIMALS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 21-2081 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 28, 29 |
| | : | | |
| MARTHA WILLIAMS, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment; Granting in Part and Denying in Part Defendants' Motion for Summary Judgment

## I. INTRODUCTION

Plaintiff Friends of Animals filed this suit in order to ask the Court to set aside the United States Fish and Wildlife Service's (the "Service") decision to list a rare species of parrot as merely threatened, rather than fully endangered, as well as the Service's corresponding decision to allow limited import, export, and interstate trade of the bird without an Endangered Species Act permit. Generally speaking, Friends of Animals alleges that the Service's decisions violated the Administrative Procedure Act ("APA") and the Endangered Species Act ("ESA"). The parties have cross-moved for summary judgment. For the reasons that follow, the Court grants in part and denies in part Plaintiff's motion for summary judgment, and grants in part and denies in part the Service's motion for summary judgment.

## II. BACKGROUND

### A. The Endangered Species Act

Congress enacted the ESA "to conserve species and their ecosystems, 16 U.S.C. § 1531(b), and to 'halt and reverse the trend toward species extinction, whatever the cost.'" *Ctr.*

*for Biological Diversity v. E.P.A.*, 56 F.4th 55, 61 (D.C. Cir. 2022) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)).  The ESA requires the Secretary of the Interior to maintain a list of all "species" she determines to be "endangered" or "threatened."  16 U.S.C. § 1533(c)(1).  A "species" can be broad or narrow; as relevant here, it can "include[] any subspecies of . . . wildlife . . . , and any distinct population segment of any species of . . . wildlife which interbreeds when mature."  *Id.* § 1532(16).  The ESA defines an "endangered" species as one "which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), and a "threatened" species as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20).  The Secretary of the Interior has delegated her responsibility for determining whether terrestrial species are endangered or threatened to the Service.  *See Ctr. for Biological Diversity v. Haaland*, No. 20-cv-573, 2023 WL 2401662, at *1 n.4 (D.D.C. Mar. 8, 2023).

The ESA allows any "interested person[s]" to petition the Service to list a species as endangered or threatened.  16 U.S.C. § 1533(b)(3)(A); *see N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, No. 21-cv-3263, 2024 WL 894911, at *2 (D.D.C. Feb. 28, 2024).  Once an interested party submits a petition to list a species, the Service has ninety days to determine "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).  If the Service decides that the petition meets this standard, it then has twelve months to "review . . . the status of the species concerned" and determine whether an endangered or threatened listing is warranted.  *Id.* § 1533(b)(3)(A)–(B).  If such listing is warranted, the Service is required to publish in the Federal Register "a proposed regulation to implement" the listing, and the agency must also give the public an opportunity to comment on the proposal.  *Id.* § 1533(b)(3)(B)(ii), (b)(5).  Within

one year of publishing the proposed rule, the Service must publish a final regulation placing the species on the endangered or threatened list, withdraw the proposed rule, or provide notice that an extension of up to six months is required. *Id.* § 1533(b)(6)(A)–(B).

Section 4(a)(1) of the ESA requires the Service to assess five factors in determining whether to list a species as endangered or threatened, any one of which may provide a sufficient basis upon which the Service may conclude that a species should be so listed. *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1079 (D.C. Cir. 2017). Those factors are: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; [and] (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). In evaluating these factors, the Service is required to act "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any," by any government "to protect such species." *Id.* § 1533(b)(1)(A); *see Defs. of Wildlife*, 849 F.3d at 1079.

A species listed as endangered receives more statutory protections than one listed as threatened. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 21-cv-791, 2023 WL 6388936, at *1 (D.D.C. Sept. 30, 2023). That is because "[w]hen a species is listed as endangered, several statutory prohibitions automatically apply to it," *id.*, such as "laws prohibiting trade or taking (*e.g.*, hunting, killing, capturing) of the species," *Friends of Animals v. Williams*, 628 F. Supp. 3d 71, 73 (D.D.C. 2022); *see* 16 U.S.C. § 1538(a)(1)(A)–(F).

By contrast, when a species is listed as threatened, the Service may, but is not required to, apply the prohibitions outlined in 16 U.S.C. § 1538(a)(1) to the threatened species. *See Sweet*

*Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 3 (D.C. Cir. 1993); *see also* 16

U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species . . . , the Secretary

shall issue such regulations as he deems necessary and advisable to provide for the conservation

of such species.  The Secretary may by regulation prohibit with respect to any threatened species

any act prohibited under section 1538(a)(1) of this title.").  Acting pursuant to its authority under

Section 4(d), the Service has issued a blanket regulation that "extend[s] the 16 U.S.C.

§ 1538(a)(1) prohibitions as to endangered species to all threatened species as well."  *Sweet*

*Home*, 1 F.3d at 5; *see* 50 C.F.R. § 17.31(a).  The Service reserved the right, however, to create

species-specific "special rule[s]," *Safari Club Int'l v. Zinke*, 878 F.3d 316, 322 (D.C. Cir. 2017),

which may withdraw particular protections that would otherwise apply to the threatened species

by virtue of the automatic extension, *Sweet Home*, 1 F.3d at 5 (explaining that the Service

"established a regime in which the prohibitions established for endangered species are extended

automatically to all threatened species by a blanket rule and then withdrawn as appropriate, by

special rule for particular species and by permit in particular situations").

### B.  Factual and Regulatory Background

The scarlet macaw (*Ara macao*) "is one of several large neotropical parrot species

commonly referred to as macaws."  Listing the Scarlet Macaw ("2019 Final Rule"), 84 Fed. Reg.

6,278, 6,284 (Feb. 26, 2019).  As the name suggests, scarlet macaws "are brilliantly colored and

predominantly scarlet red," with red, yellow, blue, and green bands of color on their wings.  *Id.*

There are two different subspecies of scarlet macaw: a northern subspecies and a southern one.

*Id.*  The northern subspecies (*Ara macao cyanoptera*) lives in Mexico, Guatemala, Nicaragua,

Honduras, Isla Coiba in Panama, and the Caribbean slope of Costa Rica.  *Id.*  The southern

species (*A. m. macao*) ranges from the Pacific slope of Costa Rica southward through parts of

Panama and into South America.  *Id.*  The southern subspecies consists of two distinct

population segments ("DPS") based on genetic differences.  *See id.*  The Northern DPS inhabits

the Pacific slope of Costa Rica, mainland Panama, and northwest Colombia.  *Id.*  The Southern

DPS is made up of scarlet macaws across the remainder of the birds' South American range,

including parts of Colombia to the south and east of the Andes Mountains, Ecuador, Peru,

Venezuela, Suriname, Guyana, French Guiana, Bolivia, and Brazil.[1]  *Id.* at 6,284, 6,286.

### 1.  2012 Proposed Rule

In 2008, Friends of Animals, an animal advocacy organization, petitioned the Service to

list all scarlet macaws as protected under the ESA.  Joint App. ("JA") at FWS000035–37, ECF

No. 33.  After receiving Plaintiff's petition, the Service began the process of determining

whether to list scarlet macaws—or the subspecies thereof—as endangered or threatened.  *See* 16

U.S.C. § 1533(b)(3).  That process initially culminated in a proposed rule in which the Service

proposed listing both the northern subspecies and the Northern DPS as endangered.  Listing the

Scarlet Macaw ("2012 Proposed Rule"), 77 Fed. Reg. 40,222 (July 6, 2012).

In its proposed rule, and as relevant here, the Service assessed in detail the threats facing

the Northern DPS pursuant to the factors enumerated in 16 U.S.C. § 1533(a)(1).  *See id.* at

40,229–41, 40,243.  The Service explained that "[t]he primary threats to the [N]orthern DPS

[include] habitat loss, illegal capture for the pet trade, the inadequacy of regulatory mechanisms

that address these threats, and small population size combined with the cumulative effects of

threats."  *Id.* at 40,243.  Regarding habitat loss, *see* 16 U.S.C. § 1533(a)(1)(A), the Service

determined that "[h]abitat destruction and modification . . . in the form of deforestation and

---

[1] Friends of Animals refers to the Northern DPS as "Middle Macaws" and the Southern
DPS as "Southern Macaws."

forest degradation are likely occurring in the range of two of the three populations in this region": the southern Pacific coast of Costa Rica and Panama, *see* 2012 Proposed Rule, 77 Fed. Reg. at 40,243.  As for threats stemming from illegal capture for the pet trade, *see* 16 U.S.C. § 1533(a)(1)(B), the Service stated that poaching was "likely occurring in the range of all three populations [of the Northern DPS], and is exacerbated by deforestation because deforestation increases access to these birds," 2012 Proposed Rule, 77 Fed. Reg. at 40,243; *see also id.* at 40,236.  Third, the Service concluded that existing regulatory mechanisms, *see* 16 U.S.C. § 1533(a)(1)(D), were "inadequate to prevent further loss of forest habitat and continued capture and trade of the species," 2012 Proposed Rule, 77 Fed. Reg. at 40,243; *see also id.* at 40,238–39.  Finally, the agency found that the Northern DPS's small population size, coupled with the DPS's fragmentation across isolated ranges, presented an additional threat to the DPS.  *See id.* at 40,240–41, 40,243; *see also* 16 U.S.C. § 1533(a)(1)(E).  In light of those findings, the Service explained that:

> Given (1) the large extent of the decline of the subspecies within the [N]orthern DPS . . . in recent decades due to habitat destruction and modification and capture for the illegal pet trade, (2) that these threats are ongoing within the range of this DPS, (3) that existing regulatory mechanisms addressing these threats are inadequate, and (4) [that] no information indicat[es] that these threats are being ameliorated, we find that these threats are immediate and significant and place the [N]orthern DPS . . . in danger of extinction at this time.  Therefore, on the basis of the best scientific and commercial information available, we find that the [N]orthern DPS . . . meets the definition of an "endangered species" under the Act, and we are proposing to list the [N]orthern DPS . . . as endangered throughout its range.

2012 Proposed Rule, 77 Fed. Reg. at 40,243.

The Service separately concluded that the Southern DPS was "not in danger of extinction now, nor is it likely to become endangered within the foreseeable future throughout all or a significant portion of its range," and thus did not propose listing the Southern DPS at all.  *Id.* at 40,246.  That said, the Service also stated that it was considering whether to list the Southern

DPS under the ESA given those birds' "similarity of appearance to entities proposed for listing" under the proposed rule.  *Id.*

The Service accepted public comments on the proposed rule over the ensuing sixty-day period.  But the Service did not move to publish a final rule upon closure of the comment period or in the months and years that followed.

### 2.  2016 Proposed Rule

Instead, in 2016, the Service issued a new proposed rule.  *See* Listing the Scarlet Macaw ("2016 Proposed Rule"), 81 Fed. Reg. 20,302 (Apr. 7, 2016).  The 2016 Proposed Rule made five primary, substantive changes to the rule that had been proposed four years prior, three of which are particularly relevant here.  *See id.* at 20,303.  First, the Service downgraded the proposed listing of the Northern DPS from endangered to threatened.[2]  *Id.* at 20,309–12.  Second, the Service decided to list the Southern DPS as threatened—not because the threats facing these birds had increased, but rather because macaws of the Southern DPS so closely resemble birds in the northern subspecies and the Northern DPS that the Service determined listing the southern-most population would "substantially facilitate law enforcement actions to protect and conserve scarlet macaws."  *Id.* at 20,312–13.  Third, exercising its authority under Section 4(d) of the ESA, the Service proposed to adopt a special, species-specific rule applicable to the southern subspecies—*i.e.*, the Northern and Southern DPS—as well as subspecies crosses of the northern and southern subspecies.  *See id.* at 20,313–14.  Under the proposed special rule, the Service explained that "all prohibitions" included in 50 C.F.R. § 17.31 would apply to the macaws to be listed as threatened, "except that import and export of certain [southern

---

[2] The Service reaffirmed its previous decision to list the northern subspecies as endangered.  2016 Proposed Rule, 81 Fed. Reg. at 20,309.

subspecies] and scarlet macaw subspecies crosses into and from the United States and certain acts in interstate commerce will be allowed without a permit under the [ESA]." *Id.* at 20,314.

In issuing its new proposal, the agency explained that, "based on new information and information overlooked in the development" of the 2012 Proposed Rule, it had "reevaluat[ed] the status" of the Northern DPS. *Id.* at 20,302. The new information cited by the agency included comments submitted by two peer reviewers during the public comment period. *Id.* at 20,309. The Service stated that it had "also obtained additional information on scarlet macaw status and threats in this DPS from additional experts and literature sources." *Id.* at 20,310. All told, the agency explained that this new and previously "overlooked" information had caused it to (1) "revise[] the area of this DPS such that scarlet macaws" on Isla Coiba—an island off the coast of Panama—"[a]re no longer considered part of this DPS," and, most importantly, (2) "revis[e] [its] proposed listing of th[e] [Northern] DPS from endangered status to threatened status." *Id.* at 20,302–03, 20,310.

As a result of its finding that the birds on Isla Coiba no longer fell within the Northern DPS, the Service focused the remainder of its analysis on the Northern DPS populations in Central Pacific Costa Rica ("ACOPAC"), South Pacific Costa Rica ("ACOSA"), and northwest Colombia. *See id.* at 20,310. The Service explained that there were approximately 450 scarlet macaws in ACOPAC and that this figure was fairly "stable" despite the birds' susceptibility to "overharvest" and "poaching." *Id.* The Service then concluded that the "apparent stability of the population indicates that poaching may not currently be [a] major threat[] to th[e] population" living in ACOPAC. *Id.* at 20,311.

The agency reached a similar conclusion regarding the estimated 800 to 1,200 birds making up the ACOSA segment. *See id.* at 20,310–11. For this segment, the Service explained

that it had received "anecdotal information" suggesting that "scarlet macaws are being seen more commonly north of the Osa Peninsula, and it seems as though the species may be spreading north through this region." *Id.* at 20,310.  Another commenter added that "dozens [of scarlet macaws] can be seen on a daily basis on his property at the north end of the Gulfo Dulce, where 10 years ago, none existed." *Id.*  The agency also re-examined a study that it had cited in the 2012 Proposed Rule, which "indicate[d] that 85 percent of residents interviewed in 2005 believed scarlet macaws were more abundant than 5 years prior" in the ACOSA region. *Id.*  That same study concluded (1) that the ACOSA population has increased, "(2) that the population 'is currently stable with the distribution thought to be increasing,'" and (3) that although poaching was still occurring, it had "decreased." *Id.*  Taking all of this information into account, the Service determined that the "ACOSA scarlet macaw population is currently stable" and that "poaching is not currently having a negative impact." *Id.* at 20,312.

Finally, the agency explained that it was unable to estimate how many Northern DPS birds remained in northwest Colombia and that the population was "probably close to extinction" across most of the area. *Id.* at 20,310.  Threats to any remaining birds included "habitat loss" and poaching. *Id.* at 20,310.  The agency's outlook for any remaining birds in the area was grim: "[b]ecause deforestation has resulted in the near extirpation of the species from large areas of northwest Colombia and deforestation is projected to continue within the species' range in this region, it is reasonable to conclude that deforestation is a significant threat to the species in northwest Colombia." *Id.* at 20,312.

Taking all of this into account, the Service explained that its proposal to list the Northern DPS as threatened rather than endangered rested on the fact that the "new information" it had considered indicated that the size of "the ACOPAC population is currently stable, and that the

ACOSA population—the largest of the DPS—is currently stable or possibly increasing." *Id.*
Furthermore, the agency concluded that "[n]ew information indicates that poaching does not
currently act as a threat on these two populations." *Id.* In short, because "the two largest
populations within the DPS are currently stable," the Service ultimately determined that "it is
reasonable to conclude that the [N]orthern DPS . . . is not currently in danger of extinction." *Id.*
This was despite the fact that any remaining scarlet macaws in northwest Colombia "face[d]
significant ongoing threats and may be potentially extirpated from Colombia." *Id.*

The Service invited public comment on the newly proposed rule (although the Service
also clarified that "[c]omments previously submitted [on the 2012 Proposed Rule] [would] be
considered and [did] not need to be resubmitted"). *Id.* at 20,302. The comment period closed in
July 2016.

### 3. 2019 Final Rule

Again, though, the agency delayed taking action. Then, in 2019, the Service published a
final rule that was, in essentially all material respects, consistent with the 2016 Proposed Rule.
*See* 2019 Final Rule, 84 Fed. Reg. 6,278. The Final Rule listed the northern subspecies as
endangered, the Northern DPS as threatened, and the Southern DPS as threatened based on
"similarity of appearance." *Id.* at 6,278.

In issuing the final rule, the agency explained that, in addition to the reasons outlined in
the 2016 Proposed Rule, the Service's listing decision was based on information indicating that
the Northern DPS populations in Costa Rica "are likely increasing." *Id.* at 6,279; *see also id.*
6,281 (citing studies suggesting that the Northern DPS populations in Costa Rica "appear to be
increasing and appear stable even with ongoing poaching pressure"); *id.* at 6,294 ("[T]he best
available information indicates that the scarlet macaw population in Costa Rica appears to be

increasing, . . . .").  Thus, the agency explained that "[b]ecause information indicates that the

ACOPAC and ACOSA populations in Costa Rica, which make up the bulk of the [N]orthern

DPS . . . , may be stable and likely increasing and expanding their range on the Pacific slope of

Costa Rica, it is reasonable to conclude that the [N]orthern DPS . . . is not currently in danger of

extinction and does not meet the definition of an 'endangered species' under the [ESA]."  *Id.* at

6,308.  Nonetheless, the Service continued that "although the two largest populations currently

appear to be increasing, they both are small and their total range represents only a portion of the

range of the [N]orthern DPS."  *Id.*  That fact, combined with continued deforestation in

Colombia; ongoing poaching in Costa Rica and mainland Panama; "ongoing, small-scale,

subsistence logging in Panama; inadequate enforcement of existing regulations; and the small

population sizes of scarlet macaws in this region put this DPS in danger of extinction in the

foreseeable future."  *Id.*  As a result, the agency re-affirmed its decision to list the Northern DPS

as "threatened."  *Id.*

The Final Rule also adopted the species-specific Section 4(d) rule that the agency had

proposed three years earlier.  *Id.* at 6,309–10.  The Section 4(d) rule applies to the southern

subspecies and macaws that are cross-species of the northern and southern subspecies.  *Id.* at

6,309.  Although it extends to those macaws almost all of the prohibitions outlined in 50 C.F.R.

17.31, it allows, under certain circumstances, for the import and export of those macaws without

an ESA permit.  *Id.*  Specifically, a covered macaw may be imported or exported without an ESA

permit if it was held in captivity prior to the date of the listing of the species or was bred in

captivity and is importable or exportable under the terms of the Convention on International

Trade in Endangered Species of Wild Fauna and Flora and the Wild Bird Conservation Act.  *Id.*

Additionally, certain interstate commercial activities are allowed without an ESA permit.  *Id.* at 6,310.

### C.  Procedural Background

Friends of Animals filed the instant lawsuit in 2021.  *See* Compl., ECF No. 1.  In its complaint, Friends of Animals sought vacatur of the Service's finding that the Northern DPS should be listed as threatened (the "Threatened Finding") and of the Section 4(d) rule.  *See Friends of Animals*, 628 F. Supp. 3d at 74.  The organization argued that both the agency's decision to list the Northern DPS as threatened and the agency's Section 4(d) rule violated the ESA and were arbitrary and capricious under the APA.  *See id.*

The Service initially moved to dismiss the complaint, but it later withdrew the motion and instead moved for voluntary remand of its listing of the Northern DPS and the Section 4(d) rule so that it could "further consider the impact" of the holding in *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), a case which was decided after it had issued the 2019 Final Rule.  *Friends of Animals*, 628 F. Supp. 3d at 75.  Relevant here (and described in greater detail below), *Center for Biological Diversity* vacated the Service's prior policy for analyzing whether a species "is in danger of extinction throughout . . . a significant portion of its range," *id.* (quoting 16 U.S.C. § 1532(6))—a policy that the Service had relied upon in assessing whether to list the Northern DPS as endangered in this case, *see id.*  The Court therefore granted the Service's motion for voluntary remand, which allowed the Service to "reconsider—or really, conduct for the first time—the [significant-portion-of-its-range ("SPR")] analysis it conducted in connection with the Threatened Finding."  *See id.* at 76, 85 (footnote omitted).

Following remand, the Service gave notice of—and then conducted—an SPR analysis of the Northern DPS.  *See* Possible Effects of Court Decision on Significant Portion of the Range Analysis ("SPR Notice"), 87 Fed. Reg. 66,093 (Nov. 2, 2022); Significant Portion of Its Range Analysis for the Northern Distinct Population Segment ("2023 SPR Analysis"), 88 Fed. Reg. 19,549 (Apr. 3, 2023).  After conducting that analysis, the agency determined that the Northern DPS was not in danger of extinction throughout a significant portion of its range, and thus reaffirmed its decision to list the Northern DPS as threatened rather than endangered.  2023 SPR Analysis, 88 Fed. Reg. at 19,558–59.

In response, Friends of Animals filed an amended complaint.  *See* Am. Compl., ECF No. 24.  Like the initial complaint, the amended complaint challenges the Service's decision to list the Northern DPS as threatened, and also adds allegations regarding the substance of the Service's SPR analysis and the conclusions reached.  *See id.* at 25.  Additionally, Friends of Animals alleges that, in undertaking the SPR analysis, the Service violated the APA by failing to provide the public with a meaningful opportunity to comment on that analysis.  *See id.* at 26.  Finally, Friends of Animals challenges the agency's Section 4(d) rule.  *See id.* at 25.

The parties now cross-move for summary judgment on Plaintiff's claims.  *See* Pl.'s Mem. P. & A. Supp. Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 28; Defs.' Combined Mem. P. & A. Supp. Cross-Mot. Summ. J. and Opp'n Pl.'s Mot. Summ. J. ("Defs.' MSJ"), ECF No. 29.  The parties' motions are ripe for review.  *See* Pl.'s Mem. P. & A. Opp'n Defs.' Cross-Mot. Summ. J. and Reply Supp. Mot. Summ. J. ("Pl.'s Reply"), ECF No. 30; Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 32.

## III.  LEGAL STANDARD

A court must grant summary judgment when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In cases involving review of agency action under the APA, however, Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record."  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011) (citations omitted).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citation omitted).  Summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and [is] otherwise consistent with the APA standard of review."  *Id.*

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).  The scope of the court's review is narrow, and a court must not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Indeed, an agency's decision is presumed to be valid.  *See Am. Radio Relay League, Inc. v. F.C.C.*, 617 F.2d 875, 879 (D.C. Cir. 1980).

## IV.  ANALYSIS

Friends of Animals challenges the Service's listing decision on four main grounds.  First, Plaintiff argues that the Service violated the APA and the ESA by deciding to list the Northern

DPS as merely threatened rather than endangered.  Second, Plaintiff contends that the SPR analysis the Service conducted following this Court's grant of voluntary remand was both procedurally and substantively deficient.  Third, Friends of Animals argues that the Service erred by not listing the Southern DPS as endangered based on its similarity of appearance to the northern subspecies and, relatedly, by completely failing to consider whether to list the Northern DPS as endangered based on the same rationale.  Finally, Plaintiff seeks vacatur of the Section 4(d) rule that pertains to the southern subspecies.  The Court addresses these contentions in turn.

### A.  The Service's Decision to List the Northern DPS as Threatened

Friends of Animals first contends that the Service acted arbitrarily and capriciously by listing the Northern DPS as threatened rather than endangered.  Specifically, Plaintiff argues that the Service did not adequately explain the basis for its 2016 determination—a determination that was finalized in the 2019 Final Rule—that the Northern DPS should be listed as threatened when, four years earlier, it had decided that the Northern DPS should be listed as endangered. *See* Pl.'s MSJ 15–17.  Friends of Animals also contends that the Service violated the ESA and the APA by failing to "rely on the best scientific data available" in reaching this determination. *See id.* at 17–22.

In reviewing administrative action such as the Service's listing decision in this case, the Court is mindful of the "highly deferential" nature of its review.  *See Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019).  Where, as here, agency action "involv[es] scientific analysis and 'technical expertise,'" courts must be particularly careful not to substitute their "judgment for that of [the] agency."  *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66, 86 (D.D.C. 2017) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)); *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1, 14 (D.C. Cir. 2016) (explaining that

"deference is appropriate to the agency's evaluation of scientific data within its technical expertise"). This helps to ensure that agencies "have discretion to rely on the reasonable opinions of [their] own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *See Marsh*, 490 U.S. at 378. Of equal importance, the APA does not require an agency to "explain its conclusions with crystal clarity." *Nat. Res. Def. Council*, 244 F. Supp. 3d at 86. "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (internal quotation marks omitted).

At the same time, courts reviewing agency action "are not a 'rubber stamp.'" *Oceana*, 920 F.3d at 863. It is the court's job to ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. This responsibility stems from the fact that the APA "requires agencies to engage in reasoned decisionmaking" and to "reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020)). Put plainly, the agency must articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). If an agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," then the court must set aside the agency's action as arbitrary and capricious. *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*,

628 F. Supp. 3d 189, 210 (D.D.C. 2022) (quoting *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020)).

Friends of Animals contends that the Service acted arbitrarily and capriciously when, in 2016, it decided to list the Northern DPS as threatened rather than endangered.  *See* Pl.'s MSJ at 15–17.  Plaintiff argues that the agency failed to provide a "reasoned explanation" for this shift in position, especially because, according to Plaintiff, the agency's Threatened Finding relied on much the same evidence on which the agency's earlier proposal to list the Northern DPS as endangered had relied.  *See id.* at 15 (citation omitted).

To that end, Friends of Animals emphasizes that when an agency changes its policy on a given topic, the agency "must show that there are good reasons for the new policy."  Pl.'s MSJ at 15 (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (explaining that "[w]here an agency changes a policy or practice, it 'is obligated to supply a reasoned analysis for the change'" (quoting *State Farm*, 463 U.S. at 422)).  While that may be so, in most cases, "no specially demanding burden of justification . . . applies to a mere policy change."  *Ark Initiative*, 816 F.3d at 127.  Generally, an agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one."  *Fox*, 556 U.S. at 515.  So long as the agency "display[s] awareness that it *is* changing position, . . . it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*  The general rule, then, is that "there is no requirement that the policy change be justified by reasons more substantial than those the agency relied on to adopt the policy in the first place."  *Arkema Inc. v. E.P.A.*, 618 F.3d 1, 6 (D.C. Cir. 2010).

There is, however, an exception to that general rule.  That exception is triggered "[w]hen a 'new policy rests upon factual findings that contradict those which underlay [the agency's] prior policy." *Ark Initiative*, 816 F.3d at 127 (quoting *Fox*, 556 U.S. at 515).  In such cases, an agency must offer a reasoned, "more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* (citation omitted); *see also Fox*, 556 U.S. at 516 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.")*; Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 521 (D.C. Cir. 2009) ("[I]f the relevant facts have changed or the [agency] has reasonably made a different policy judgment, then it need only explain itself and we will defer.").  If the agency instead chooses to "ignore such matters," then its action is arbitrary and capricious.  *Fox*, 556 U.S. at 515.

Friends of Animals contends that that is precisely what the Service did here.  It argues that the agency's 2016 proposal to list the Northern DPS as threatened "relie[d] on data that was largely available and employed" by the Service in 2012 when it proposed to list the DPS as endangered.  *See* Pl.'s MSJ at 15 (quoting *Inst. for Wildlife Prot. v. Norton*, 174 F. App'x 363, 366 (9th Cir. 2006)).  It further argues that "what little new evidence [the agency] did rely on did 'not provide new information to support the agency's change of course.'" *Id.* (quoting *Inst. for Wildlife Prot.*, 174 F. App'x at 366).  All that being so, Friends of Animals concludes that the Service failed to reasonably explain how it decided, in 2016, that the Northern DPS was threatened after considering largely the same data that, in 2012, had led the agency to determine the Northern DPS was endangered.  *See id.* at 17.

To understand Plaintiff's argument, it is necessary to understand how the Service's assessment of the Section 4(a)(1) factors—that is, the factors the Service must consider to

determine whether a species is endangered or threatened, *see* 16 U.S.C. § 1533(a)(1)—evolved

from 2012 to 2016 and from 2016 to 2019.  Friends of Animals asserts—and the Service does

not meaningfully dispute—that, in almost all material respects, the agency's assessment of many

of the Section 4(a)(1) factors remained unchanged over this time period.  *See* Pl.'s MSJ at 16

(arguing that, between 2012 and 2016, "[the Service] did not revisit the vast majority of th[e]

findings" which had led it to propose listing the Northern DPS as endangered).  According to

Friends of Animals, the principal exceptions concerned the agency's assessment of (1) the threat

posed by poaching and (2) the stability and distribution of the Northern DPS in Costa Rica.  *See*

*id.*  Having thoroughly reviewed the record, the Court agrees that the agency's consideration—

or, rather, reconsideration—of these two factors was the driving force behind its decision to list

the Northern DPS as threatened rather than endangered.[3]  The question then, is whether the

agency provided a sufficiently reasoned explanation of how its reassessment of the poaching

threat and the Northern DPS's stability led it to conclude that the DPS was not at risk of

imminent extinction.  The Court concludes that it did.

---

[3] In 2012, the Service "identified threats to [the Northern DPS] attributable to" four of the
five Section 4(a)(1) factors.  *See* 2012 Proposed Rule, 77 Fed. Reg. at 40,242 (describing the
threats as "habitat loss, illegal capture for the pet trade, the inadequacy of regulatory mechanisms
that address these threats, and small population size combined with the cumulative effects of
threats").  In 2016, the Service acknowledged all of these threats, *see* 2016 Proposed Rule, 81
Fed. Reg. at 20,309, but then focused predominantly on the threat posed by poaching—as well as
the population's stability and distribution—when discussing its reevaluation of the status of the
Northern DPS in Costa Rica, *see id.* at 20,310–12.  The agency seemingly did not revisit its prior
conclusions concerning habitat loss or the inadequacy of regulatory mechanisms.  And in 2019,
the agency's conclusions regarding these latter threats matched those that it had reached in 2012.
*Compare, e.g.*, 2019 Final Rule, 84 Fed. Reg. at 6,294 ("We conclude that deforestation or forest
degradation in the current range of the scarlet macaw in Costa Rica is not occurring at a level
that is causing a further decline in the species."), *with* 2012 Proposed Rule, 77 Fed. Reg. at
40,231 ("[W]e are unaware of any information indicating that deforestation or forest degradation
in the current range of the scarlet macaw in Costa Rica is occurring at a level that is causing or
likely to cause a decline in the species.").

Start with the evolution of the agency's assessment of the Northern DPS's stability and distribution, which focused predominantly on the portion of the DPS living in the ACOPAC and ACOSA regions of Costa Rica.  In 2012, the agency's assessment was fairly limited.  The agency explained that the ACOPAC "population was self-sustaining from 1996–2003," 2012 Proposed Rule, 77 Fed. Reg. at 40,235 (citing 2005 study by Vaughn *et al.*); *see also id.* at 40,227, but it did not draw conclusions regarding the population's stability over the decade that followed.  As for ACOSA, the agency noted that, according to a study by Dear *et al.*, eighty-five percent of local residents "believed [that] scarlet macaws were more abundant" in 2005 than in 2000, "which suggests [that] this population may be increasing."  *Id.* at 40,227, 40,236.

In 2016, the agency shifted its stance somewhat regarding the ACOPAC population, explaining that it now considered the population to be "stable."  2016 Proposed Rule, 81 Fed. Reg. at 20,312.  The shift in the agency's conclusion was driven by information provided by a "peer reviewer," who informed the Service that "the population at ACOPAC has been variably increasing and declining but is not in drastic decline."  *Id.* at 20,310.  With regard to ACOSA, the agency's conclusion did not shift significantly from 2012: the agency determined that the ACOSA population was at least "stable" and possibly "increasing."[4]  *Id.* at 20,312.  But in contrast to 2012, the agency's assessment relied on more information than just the single study by Dear *et al.*  Specifically, the agency considered "two pieces" of new, "anecdotal information," from comments made by members of the public in response to the 2012 Proposed Rule.  *Id.* at 20,310.  One commenter relayed that he had received reports from "land owners" in the region who were apparently seeing scarlet macaws "more commonly north of the Osa Peninsula,"

---

[4] The agency did, however, add that the *distribution* of macaws in this region was "increasing."  2016 Proposed Rule, 81 Fed. Reg. at 20,312.

suggesting that "the species may be spreading north through th[e] region." *Id.* Another commenter reported that "dozens" of scarlet macaws could now be seen "on a daily basis on his property at the north end of the Gulfo Dulce, where 10 years ago, none existed." *Id.* The agency also re-examined the Dear study which had formed the basis for the conclusions regarding the ACOSA population's stability that the Service had reached in 2012. As it had in 2012, the Service referred to the fact that, according to the study, eighty-five percent of local residents believed that scarlet macaws were more abundant in 2005 than in 2000. *Id.* Unlike in 2012, the agency also explained that the Dear study concluded that "(1) the ACOSA population has increased and (2) that the population is currently stable with the distribution thought to be increasing." *Id.* (internal quotation marks omitted). But acknowledging the limits of this study, the agency did not go as far as Dear—it instead determined that the ACOSA population was "stable" and its distribution was "increasing." *Id.* at 20,311–12.

Finally, in 2019, the agency concluded that the ACOPAC population was "likely stable or increasing." 2019 Final Rule, 84 Fed. Reg. at 6,281. In support of this conclusion, the agency cited the studies by Vaughn and Dear, as well as a comment received in response to the 2016 Proposed Rule. *See id.* (citing Vaughn *et al.* (2005), Dear *et al.* (2010), and a comment submitted by peer-reviewer Donald Brightsmith); *see also id.* at 6,298. With respect to ACOSA, the Service concluded, like it had in 2016, that the population was at least "stable" and "likely increasing." *Id.* at 6,308.

The Service's findings regarding the Northern DPS's stability in Costa Rica were the reason that the agency ultimately determined that an endangered listing of the DPS was not warranted. The Service explained that:

> Because information indicates that the ACOPAC and ACOSA populations in
> Costa Rica, which make up the bulk of the [N]orthern DPS . . . , may be stable

> and likely increasing and expanding their range on the Pacific slope of Costa
> Rica, it is reasonable to conclude that the [N]orthern DPS . . . is not currently in
> danger of extinction and does not meet the definition of an "endangered species."

*See id.* at 6,308.  In light of the regulatory history just described, the Court finds that the agency

adequately justified this conclusion and its shift in position from 2012.  That is because, in 2016

and again in 2019, the agency appropriately accounted for, and relied upon, new information

regarding the stability of the Northern DPS populations in Costa Rica.[5]  As another court in this

district has explained in a similar context, an agency's "[r]eliance on relevant new data is a

powerful explanation for policy change."  *Ctr. for Biological Diversity*, 2023 WL 6388936, at

*24; *see also Mingo Logan Coal Co. v. E.P.A.*, 829 F.3d 710, 727 (D.C. Cir. 2016)

("[E]xplanations relying on new data are sufficient to satisfy the more detailed explanatory

obligation discussed by *Fox*.").  Moreover, the Service's shift in position stemmed from the

Service's appropriate incorporation of information from the comments it received in response to

the 2012 and 2016 Proposed Rules.  *See Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp.

3d 472, 498–99 (D.D.C. 2020) ("An agency 'is not required to adopt a final rule that is identical

to the proposed rule,'" but to "the contrary, '[a]gencies are free—indeed, they are encouraged—

to modify proposed rules as a result of the comments they receive.'" (quoting *Ne. Md. Waste

Disposal Auth. v. E.P.A.*, 358 F.3d 936, 951 (D.C. Cir. 2004) (per curiam))).  Friends of Animals

takes issue with the *quality* of the new information, *see* Pl.'s MSJ at 17–22—a point addressed

below.  But the fact remains that, at each successive stage of the process, the agency relied upon

---

[5] Contrary to Plaintiff's assertion, this conclusion is not undermined by the fact that the
Service also decided that scarlet macaws on Isla Coiba in Panama belonged to the northern
subspecies rather than the Northern DPS.  *See* Pl.'s MSJ at 15–16.  The Service's decision to list
the Northern DPS was based on its assessment of the population's stability, not the raw number
of birds of which the population was composed.  The exclusion of Isla Coiba macaws from the
Northern DPS meant that the DPS consisted of fewer birds but did nothing to impact the
Service's assessment of the stability of that smaller population.

and discussed new data to inform its assessment of the Northern DPS's stability which, in turn, was the driving factor behind its decision that the Northern DPS was not immediately at risk of extinction. *See* 2019 Final Rule, 84 Fed. Reg. at 6,308. Consequently, the Court finds that the agency satisfactorily explained why its eventual listing of the Northern DPS differed from its initial proposal.

Friends of Animals resists this conclusion on numerous grounds. First and foremost, Plaintiff charges that the agency did not adequately explain its shifting position concerning the threat to the Northern DPS posed by poaching. *See* Pl.'s MSJ at 16–17. The Court agrees that the Service's explanation on this front is lacking. The Service's inadequate explanation is best exemplified by its evolving assessment of the poaching threat in the ACOPAC region. In 2012, the Service described the level of poaching in ACOPAC as "increasing" and "unsustainable." *See* 2012 Proposed Rule, 77 Fed. Reg. at 40,235–37 (citing a 2010 study by Huson); *id.* at 40,236 (concluding that "poaching [in ACOPAC] is on the rise and . . . officials believe they do not have the resources to control it"). In 2016, the Service revised this assessment, concluding that poaching still "occur[s]" but "may not currently be [a] major threat[]." 2016 Proposed Rule, 81 Fed. Reg. at 20,311. In reaching this conclusion, the agency did not cite any new information, data, or studies. Instead, the agency's conclusion rested entirely on a study by Vaughn (which the Service had cited in 2012) that described the population as stable from 1996 to 2003. *See id.* ("However, the population was holding steady even with the amount of poaching occurring [from 1996 to 2003]. This apparent stability of the population indicates that poaching may not currently be major threats to this population." (citation omitted)). The study did not address the poaching threat directly. And although the agency later stated that it had received "[n]ew information indicat[ing] that poaching does not currently act as a threat on" the

ACOPAC population, *see id.* at 20,312, the agency provided no citation or explanation of what that "new information" was.[6]

In contrast to the Service's assessment of the poaching threat to scarlet macaws in ACOPAC, the agency's evaluation of poachers' impact on macaws in ACOSA remained largely consistent.  In 2012, the Service relied on the previously-mentioned Dear study to find that poaching in that region had "decreased" but "still occurs."  2012 Proposed Rule, 77 Fed. Reg. at 40,236.  In 2016, the Service similarly concluded that "poaching still exists" but has "decreased."  2016 Proposed Rule, 81 Fed. Reg. at 20,310.  And in 2019, the Service again determined that the illicit activity "is ongoing but has decreased."  2019 Final Rule, 84 Fed. Reg. at 6,298.

Based on the foregoing, had the Service's decision to list the Northern DPS as threatened rather than endangered been based solely on the agency's assessment of the poaching threat, the Court would likely find that the Service had failed to adequately justify its revised listing decision.  After all, the Service's conclusions regarding poaching in ACOPAC shifted based on essentially no new information, and its conclusions regarding poaching in ACOSA remained materially unchanged from 2012 to 2019.  But as explained above, it was the Service's assessment of the Northern DPS's stability—*not* its assessment of the poaching threat—that led it to determine that the Northern DPS was threatened rather than endangered.  *See* 2019 Final Rule, 84 Fed. Reg. at 6,308.  Indeed, in the end, the Service recognized that poaching remained a significant threat, *see id.* ("Poaching continues and remains a concern for the future viability of the [Northern DPS] for the foreseeable future."), and that finding was a major factor in the Service's ultimate conclusion that the Northern DPS should still be listed as threatened (as

---

[6] In 2019, the agency retreated somewhat from its 2016 stance, concluding that poaching of the ACOPAC population "continues to be a serious problem."  2019 Final Rule, 84 Fed. Reg. at 6,298 (citing Vaughn *et al.* (2005) and information from Mark McReynolds).

opposed to not listed at all) despite the above-described findings regarding the population's

stability in Costa Rica, *see id.* (explaining that "ongoing poaching of scarlet macaws in Costa

Rica," coupled with other factors, "put th[e] [Northern] DPS in danger of extinction in the

foreseeable future").  That being so, the Court is not persuaded that the agency's reevaluation of

the poaching threat rendered the final rule an arbitrary and capricious exercise of the Service's

authority.

Friends of Animals's next line of attack faults the Service for failing to "rely on the best

scientific data available" in determining that the Northern DPS was threatened rather than

endangered.  *See* Pl.'s MSJ at 17–22.  Recall that the ESA requires that listing decisions be made

"solely on the basis of the best scientific and commercial data available."  16 U.S.C.

§ 1533(b)(1)(A).  That requirement "prohibits [the Service] from disregarding available scientific

evidence that is in some way better than the evidence [it] relies on."  *Am. Wildlands v.*

*Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008) (emphasis omitted) (quoting *Sw. Ctr. for*

*Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)).  Friends of Animals says that

the Service violated this mandate when it chose to credit allegedly inferior "new information,"

such as "anecdotal information" provided by commenters.  *See* Pl.'s MSJ at 18–19.  It also

contends that "the evidence underlying the 2012 endangered finding was far superior to the

insignificant 'new information' [the Service] cited to justify its reversal in 2016."  *Id.* at 18.

There are multiple problems with Plaintiff's argument.  The first is that—at least insofar

as the Service's findings regarding the Northern DPS's stability are concerned—the

administrative record does not suggest that the Service *disregarded*, in either 2016 or 2019,

scientific evidence that was available in 2012.  On the contrary and as the Service notes, *see*

Defs.' MSJ at 16, in both 2016 and 2019, the agency cited and discussed many of the same

studies on which it had relied to analyze the Northern DPS's stability in 2012, while also

incorporating new information, *compare* 2012 Proposed Rule, 77 Fed. Reg. at 40,227, 40,235–36

(citing studies by Vaughn *et al.* and Dear *et al.*), *with* 2016 Proposed Rule, 81 Fed. Reg. at

20,310 (same, while also considering new information), *and* 2019 Final Rule, 84 Fed. Reg. at

6,281, 6,287–88, 6,298 (same).[7]

Plaintiff counters that the "new information" was of insufficient scientific value to justify

the Service's shift in position. *See* Pl.'s MSJ at 18 (arguing that "the evidence underlying the

2012 endangered finding was far superior to the insignificant 'new information' [the Service]

cited to justify its reversal in 2016"). Specifically, it contends that "two anecdotal reports"

should not have been enough "to override the best available science [the Service] relied on to

find [the Northern DPS] endangered in 2012." *Id.* at 19. It is far from clear, though, that the

"new information" considered by the Service—which, in 2019, also included new information

submitted by Donald Brightsmith—"overrode" any information that the Service had previously

considered. Rather, the record makes plain that the new information—which pertained

specifically to scarlet macaws in the ACOSA region of Costa Rica—simply *strengthened* the

agency's assessment of the stability (and distribution) of the Northern DPS in that area. *See*

2016 Proposed Rule, 81 Fed. Reg. at 20,310.

Moreover, the fact that the new information was anecdotal does not, in and of itself, mean

that the Service should not have relied upon it. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife*

---

[7] To the extent the Service weighed certain studies differently at different points in time
in response to public comments, *see* Pl.'s MSJ at 19–20 (challenging the Service's reassessment
of study conducted by Dear *et al.*), the Court finds that the Service acted well-within its purview,
*see Ne. Md. Waste Disposal*, 358 F.3d at 951 ("Agencies, are free — indeed, they are encouraged
— to modify proposed rules as a result of the comments they receive."). Moreover, the Court is
"ill-equipped" to gauge the specific scientific determinations the agency reached when it
reevaluated particular studies. *See N.M. Cattle Growers' Ass'n*, 2024 WL 894911, at *12.

*Serv.*, 475 F.3d 1136, 1147 (9th Cir. 2007) (faulting the service for disregarding evidence solely because it was "anecdotal").  As the Ninth Circuit has explained, "in the absence of [a rigorous, large-scale] study, credible anecdotal evidence represents the best scientific data *available* and cannot be ignored." *Id.* (cleaned up).  Here, the studies on which the Service relied in 2012 to attempt to draw conclusions regarding the stability of the Northern DPS largely relayed data or conclusions regarding the DPS's stability in the early half of the 2000s.  *See* 2012 Proposed Rule, 77 Fed. Reg. at 40,227, 40,235.  In contrast, the anecdotal information Plaintiff criticizes gave the Service at least a slightly more current understanding of the DPS's stability.  Friends of Animals does not point to any studies that post-date 2010 which would have given the Service (in 2016 or 2019) similar information, and thus the Court cannot conclude that the Service acted arbitrarily or capriciously—or violated the ESA—by taking into account the more recent anecdotal information.  *See Nw. Ecosystem All.*, 475 F.3d at 1147.  The ESA requires "the Service [to] utilize the best scientific data *available*, not the best scientific data *possible*." *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (cleaned up).  Although the "[t]he Service may not . . . disregard superior data" when it exists, where, as here, Plaintiff fails to point to such data, the Service's failure to rely on "superior data" does not violate the ESA.  *See id.* at 1246–47.

Taking a slightly different tack, Friends of Animals also argues that the Service impermissibly considered—or at least gave far too much weight to—comments supplied by peer-reviewer Donald Brightsmith.  *See* Pl.'s MSJ at 20–22.  To that end, Plaintiff argues that the Service failed to explain why it gave more weight to Brightsmith's comments than it gave to those submitted by another peer reviewer.  *See id.* at 21.  Generally speaking, "[w]here there are competing expert opinions, it is the prerogative of the [Service] to weigh those opinions and

make a policy judgment based on the scientific data." *Am. Wildlands v. Norton*, 193 F. Supp. 2d

244, 252 (D.D.C. 2002) (cleaned up); *see also Marsh*, 490 U.S. at 378 ("When specialists

express conflicting views, an agency must have discretion to rely on the reasonable opinions of

its own qualified experts even if, as an original matter, a court might find contrary views more

persuasive.").  Here, the Service acknowledged the competing opinions and then proceeded to

explain why Brightsmith's feedback, coupled with other record evidence, led it to determine that

a threatened listing for the Northern DPS was warranted.  *See* 2016 Proposed Rule, 81 Fed. Reg.

at 20,309–10.  Though the Service did not explicitly explain why it found the other reviewer's

feedback less compelling, the Court is satisfied that the agency did not ignore relevant

information, but rather "examine[d] the relevant data and . . . articulate[d] a satisfactory

explanation for its action."  *See Nat. Res. Def. Council*, 244 F. Supp. 3d at 86 (quoting *State

Farm*, 463 U.S. at 43).

    Finally, Friends of Animals faults the Service for "ignor[ing] its own policy, which

recommends creating a Species Status Assessment ["SSA"] for 'all' ESA decisions."  *See* Pl.'s

MSJ at 22 (citing FWS Species Status Assessment Framework (Aug. 2016, version 3.4) at 4,

https://www.fws.gov/sites/default/files/documents/species-status-assesment-framework-2016-08-

10.pdf).  According to the Service, the SSA Framework is a "non-binding . . . guidance

document."  Defs.' MSJ at 18.  Friends of Animals does not appear to contest this

characterization.  *See* Pl.'s Reply at 6–7.  As another court in this district has explained, the

Service's "listing decision 'cannot be overturned based on the [agency's] alleged noncompliance

with its own, nonbinding policy statements.'"  *Colo. River Cutthroat Trout v. Salazar*, 898 F.

Supp. 2d 191, 209 (D.D.C. 2012) (rejecting argument that the Service's failure "to follow its own

peer review procedures" was "contrary to the ESA's requirement to rely on the best available

science") (quoting *Bldg. Indus. Ass'n of Superior Cal. v. Babbitt*, 979 F. Supp. 893, 905 (D.D.C. 1997)). That being so—and assuming the SSA Framework is applicable here, *see* Defs.' MSJ at 18 (arguing that the SSA policy is not applicable because it was enacted after this rulemaking began)—the Service's failure to conduct an SSA in this case does not render arbitrary and capricious the Service's decision to list the Northern DPS as threatened.

In the end, the Court is persuaded that the Service's decision to list the Northern DPS as threatened adequately accounted for new data and information that the agency received in response to its earlier proposals. The Court also finds that the Service adequately explained why the new information caused it to revise its listing decision, such that the Northern DPS was listed as threatened rather than endangered. The Court, therefore, declines Friends of Animals's invitation to vacate the listing as arbitrary and capricious under the APA or as violative of the ESA.

## B. Plaintiff's Challenges to the Service's SPR Analysis

Friends of Animals next contests the Service's SPR analysis. It does so on two grounds. First, Plaintiff argues that the Service acted arbitrarily and capriciously by concluding that Panama and Colombia do not constitute a significant portion of the Northern DPS's range. *See* Pl.'s MSJ at 24–29. Second, Friends of Animals contends that the Service violated the APA's notice-and-comment requirements by unduly restricting the scope of public comments relating to the SPR analysis. *See id.* at 29–32. Because the Court agrees with Plaintiff that the Service denied it and other members of the public a meaningful opportunity to comment on the substance of the SPR analysis—and finds that vacatur and remand of the SPR analysis is warranted on that basis—it will not address Plaintiff's challenge to the merits of the analysis.

1.  Legal and Procedural Background

As noted above, the ESA provides that a species is endangered if it "is in danger of extinction throughout all *or a significant portion of its range*."  16 U.S.C. § 1532(6).  The ESA does not define the phrase "significant portion of its range," and courts "have concluded that the phrase is ambiguous."  *Ctr. for Biological Diversity*, 435 F. Supp. 3d at 89.  The Service thus "has a wide degree of discretion in determining whether [a] species is in danger throughout a significant portion of its range."  *Id.* (cleaned up).  Pursuant to that discretion, in 2014, the Service issued a regulation "which both interpret[ed] the phrase 'significant portion of its range' and explain[ed] how the Service[] w[ould] implement [its] interpretation of the phrase."  *Id.*  As relevant, the Service adopted a two-step procedure for implementation:

> The first step in our analysis of the status of a species is to determine its status throughout all of its range.  *If we determine that the species is in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range, we will list the species as endangered (or threatened) and no SPR analysis will be required.*  If the species is neither endangered nor threatened throughout all of its range, we will determine whether the species is endangered or threatened throughout a significant portion of its range.  If it is, we will list the species as endangered or threatened, respectively; if it is not, we will conclude that listing the species is not warranted.

*Id.* (emphasis added) (quoting Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" ("SPR Policy"), 79 Fed. Reg 37,578, 37,585 (July 1, 2014)).  Put simply, if the Service determined that a species was "*threatened* throughout *all* of its range," the agency would not separately consider whether the species might also be "*endangered* in a *significant portion* of its range."  *Ctr. for Biological Diversity*, 435 F. Supp. 3d at 90 (emphases added).

The Service followed that process in implementing the 2019 Final Rule.  *See* Defs.' MSJ at 6.  As a result, because the Service first "determined that the Northern DPS was threatened *throughout all* [of] its range," the agency did not separately assess whether the DPS might also

be *endangered* in a significant portion of its range.  *See id.* (emphasis added).  In other words, "the Service did not undertake an SPR analysis" at all.  *Id.*

In 2020, the district court in *Center for Biological Diversity* held that the Service's approach was inconsistent with the plain text of the ESA.  *See* 435 F. Supp. 3d at 93.  The court explained that "the statute unambiguously requires [the Service] to determine whether a species should be listed as endangered by determining whether it is: (1) 'in danger of extinction throughout all of its range'; *or* (2) 'in danger of extinction throughout . . . a significant portion of its range.'"  *Id.* (emphasis added) (quoting 16 U.S.C. § 1532(6)).  The court then explained at length how the Service's then-existing SPR approach was otherwise inconsistent both with the text of, and policy underlying, the ESA.  *See id.* at 93–96.

In light of that decision, the Service moved for voluntary remand in this case—which the Court granted—so that the agency could "reconsider its SPR analysis based on the plain language of the ESA" and the holding in *Center for Biological Diversity*.  *See Friends of Animals*, 628 F. Supp. 3d at 75.  The agency also committed to "solicit[ing] notice and comment."  *See id.*; *see also* Defs.' Mem. Supp. Mot. Voluntary Remand at 11, 16; Decl. of Gary Frazer at ¶ 20, ECF No. 17-1.  Accordingly, on remand, the Service published a "notification of additional analysis and request for comments" in the Federal Register.  SPR Notice, 87 Fed. Reg. at 66,093.  The notice informed the public that the agency would "reexamin[e] the SPR analysis for the [N]orthern DPS," but "invite[d] written comments [only] on the manner in which the plain language of the [ESA] and [*Center for Biological Diversity*] may affect" the 2019 Final Rule.  *Id.* at 66,094.  In case that was not sufficiently clear, the agency explained that it was "only" seeking "public input on whether and how [*Center for Biological Diversity*] affects the SPR analysis in the threatened determination."  *Id.*

Having notified the public, the Service then conducted an SPR analysis of the Northern

DPS.  In doing so, it engaged in the separate, two-prong analysis which had not been struck

down by *Center for Biological Diversity*.  That two-prong analysis considers (1) whether discrete

portions of a species' range are "biologically significant to the species" and (2) "whether the

species is endangered . . . in th[ose] portion[s]."  *See Nat. Res. Def. Council, Inc. v. Coit*, 597 F.

Supp. 3d 73, 84 (D.D.C. 2022) (explaining that the agency may address these prongs in either

order "but [that] both must be satisfied to list the species as endangered"); SPR Policy, 79 Fed.

Reg at 37,586–87.  Here, the Service divided the Northern DPS's range into three distinct

portions: Costa Rica's Pacific slope, mainland Panama, and northwestern Colombia.  2023 SPR

Analysis, 88 Fed. Reg. at 19,554–55.  The Service then explained that, for each of these portions,

it would assess whether "(1) the portion is significant; and (2) [whether] the [N]orthern DPS is in

danger of extinction in that portion."  *Id.* at 19,554.  It further explained that, regardless of which

question it addressed first, if it "reach[ed] a negative answer with respect to the first question," it

would not "evaluate the other question."  *Id.*

Consistent with that approach, the Service first determined that the Northern DPS

population living in Costa Rica was not in danger of extinction.  *Id.* at 19,555–56.  The agency

therefore did not consider whether the "Costa Rica portion of the [N]orthern DPS is significant."

*Id.* at 19,556.  The agency reached a different result concerning Panama and northwestern

Colombia, concluding that the remaining scarlet macaws in those regions faced an immediate

risk of extinction.  *Id.* at 19,556–58.  As to Panama, the agency explained that the remaining

Northern DPS population was "extremely small"—less than 25 birds—and that threats from

deforestation and poaching were severe.  *See id.* at 19,556–57.  Regarding Colombia, the Service

could not estimate the size of the population but acknowledged that the species was likely "close

to extinction" and that the few birds that were left faced threats from habitat loss and, to a lesser extent, the pet trade. *Id.* at 19,557–58.

Because the Service determined that the Northern DPS populations in Panama and Colombia were at risk of immediate extinction, the agency proceeded to analyze whether Panama, northwestern Colombia, or the two regions combined constituted a "significant" portion of the DPS's range. *Id.* To make this determination, the Service explained that it "considered how the portion contributes to the viability of the species." *Id.* at 19,557. It further explained that "[t]here are multiple ways in which a portion of the species' range could contribute to the viability of a species, including (but not limited to) by serving a particular role in the life history of the species (such as the breeding grounds or food source for the species), by including high-quality or unique-value habitat relative to the rest of the habitat in the range, or by representing a large percentage of the range." *Id.* Using this methodology, the Service concluded that neither Panama, Colombia, nor the two combined represented a "significant" portion of the Northern DPS's range. *Id.* at 19,557–58. This conclusion rested on the agency's determination that the total population of scarlet macaws in Panama and Colombia was very small compared to the overall population of the Northern DPS; the lack of genetic or biological distinction between the three distinct Northern DPS populations; the fact that the DPS's habitat in these countries was not of higher quality than that in Costa Rica; that there was no indication that Panama or Colombia served as a "source population" for the DPS; and that, although the exact size of the DPS's remaining range in Panama and Colombia was "unknown," "the best available information indicate[d] [that] the size" of the DPS's range in those countries "is very small and not a large percentage of the [N]orthern DPS's range." *Id.* The Service reached a similar

conclusion when analyzing whether Panama and Colombia combined was "significant" to the Northern DPS.  *Id.* at 19,558.

> 2.  The Service's Restriction of Public Comments on the SPR Analysis

With that context in mind, the Court returns to Plaintiff's challenge that the Service impermissibly restricted the scope of public comments on remand.  *See* Pl.'s MSJ at 29–32. Plaintiff contends that it was denied a "meaningful opportunity" to comment on the agency's SPR analysis, *see id.* at 29 (quoting *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002)), because the agency denied it and other members of the public an opportunity to comment on the "main substantive" question at issue on remand—that is, whether the Northern DPS is "endangered in a significant portion of [its] range," *see id.* at 30–31.  In other words, Friends of Animals takes issue with the Service's decision to solicit comments only on "'the manner in which the plain language of the [ESA]' and 'whether and how the [*Center for Biological Diversity*] opinion affects the SPR analysis."  *See id.* at 30–31 (quoting SPR Notice, 87 Fed. Reg. at 66,094).  The agency counters that restricting public comments in this manner was fully consistent with the Court's "narrow" remand order, and that, had the Service sought comments on the substance of the SPR analysis it would have "impermissibly expand[ed] the scope" of that order.  *See* Defs.' MSJ at 27.

The agency's contention rests on fundamental mischaracterizations regarding the scope and import of the Court's remand order.  As made plain by the discussion above, in issuing the 2019 Final Rule, the Service determined that the Northern DPS was threatened throughout *all* of its range and thus concededly never assessed whether the Northern DPS might nonetheless also be endangered in a significant portion of its range.  *See id.* at 6.  *Center for Biological Diversity* held that that approach was inconsistent with the "plain language" of the ESA.  *See* 435 F. Supp.

3d at 93.  Although, here, the Service did not go quite so far as to "concede[]" "that *Center for Biological Diversity*'s interpretation of the ESA [was] correct," the Service *did* represent that, were it to be granted a voluntary remand, it would "conduct an SPR analysis."  *Friends of Animals*, 628 F. Supp. 3d at 81.  The Court therefore granted the Service's motion for voluntary remand so that the agency could analyze, *in the first instance*, whether the Northern DPS was endangered in a significant portion of its range.  *See id.* at 76 ("[The Service] wishes to reconsider—*or really, conduct for the first time*—the SPR analysis it conducted in connection with the Threatened Finding . . . ." (emphasis added)); *see also id.* (referring to the agency's "new SPR analysis").  The Court further explained that, by granting the Service's motion for remand, it was returning the "core dispute to the agency"—the "core dispute" being whether the agency's Threatened Finding would be justified after the agency conducted an SPR analysis for the first time.  *See id.* at 78.

Given all of that, the Court finds that the Service failed to adequately explain why—after committing to conduct an SPR analysis that would be "undertaken with the benefit of public comment," *see id.* at 76, 81—it proceeded to seek the public's input only on "the manner in which the plain language of the [ESA] and [the *Center for Biological Diversity*] decision may" have affected the 2019 Final Rule,[8] *see* SPR Notice, 87 Fed. Reg. at 66,094, or "whether and how [*Center for Biological Diversity*] affects the SPR analysis in the threatened determination,"[9]

---

[8] The Service makes no attempt to explain how public comments would help the agency better understand the "plain language" of a statute or the import of a district court decision—questions that would most naturally seem to require legal opinions that it is far from clear the public would be well-positioned to provide.

[9] The answer to these questions would seem to be that *Center for Biological Diversity* does affect the 2019 Final Rule and that it does so by strongly suggesting that the Service's failure to conduct an SPR analysis pertaining to the Northern DPS violated the ESA. *See Ctr. for Biological Diversity*, 435 F. Supp. 3d at 93.  It further suggests that the way in which the Service needed to remedy that violation was by actually conducting an SPR analysis.  *See id.*

*see id.*  And because the Service restricted the scope of public comments to these limited issues, the Court further finds that the Service denied the public a "meaningful opportunity" to comment on the substantive SPR analysis that it had specifically sought remand to conduct.  *See Gerber*, 294 F.3d at 179 (explaining that the "opportunity for comment must be a meaningful opportunity").  Other courts have explained that an agency fails to provide an adequate opportunity to comment if, as here, it disallows or discourages comments on "relevant and significant issues" or the "substance or merits" of the regulation at issue.  *See N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (citations omitted); *cf. Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) (explaining that the opportunity to comment is not "meaningful" unless the agency "remain[s] sufficiently open-minded" to revising the rule in response to comments).  Because the Service specifically "discourage[d] comments" addressed to the "substance" of the SPR analysis, it denied the public a meaningful opportunity to comment on that analysis.[10]  *See N.C. Growers' Ass'n*, 702 F.3d at 770 (finding that agency's "content restriction" on public comments "was so severe in scope . . . that the opportunity for comment" was not meaningful).

The Service argues that, even if the agency "improperly restricted the scope of public comments on its 2023 SPR Analysis, any such error would be a harmless procedural one."  *See*

---

[10] The Service attempts to dodge the force of this conclusion by pointing to the fact that Plaintiff and other members of the public had notice and an opportunity to comment on both the 2012 and 2016 Proposed Rules.  *See* Defs.' MSJ at 25–26.  In support, the Service cites *Federal Express Corp. v. Mineta*, a case in which the D.C. Circuit found the meaningful-opportunity-to-comment requirement satisfied because the public had had a "meaningful opportunity" to comment on earlier iterations of a proposed rule.  373 F.3d 112, 120 (D.C. Cir. 2004); *see* Defs.' MSJ at 27.  The Service's reliance on *Federal Express* is misplaced: there, unlike here, the agency did not seek voluntary remand, did not expressly commit to considering comments upon remand, and did not disinvite comments going to the substance of the issue for which remand had been granted.

Defs.' MSJ at 27–29.  "The APA directs reviewing courts to take 'due account' of 'the rule of prejudicial error.'"  *First Am. Disc. Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706).  "As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error."  *Id.* (quoting *Air Canada v. DOT*, 148 F.3d 1142, 1156 (D.C. Cir. 1998)).  The D.C. Circuit has held that an agency's "utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure."  *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002); *see also Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 265 (D.D.C. 2015) (explaining that the Circuit "has 'not been hospitable to government claims of harmless error in cases' involving a failure of notice and comment" (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014))).  When it applies, this "utter failure" standard "substantially lessens if not altogether eliminates a challenging party's burden, for there will rarely if ever be no 'uncertainty' as to the error's effect, and the party is not even required to identify 'additional considerations [it] would have raised in a comment procedure.'"  *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 89 (D.D.C. 2007) (quoting *Sugar Cane Growers*, 289 F.3d at 96).

The Court doubts that this significantly "relaxed standard" applies here, given that the Service provided notice and an opportunity to comment on both the 2012 and 2016 Proposed Rules, as well as notice and limited opportunity to comment on the SPR analysis.  *See id.* (declining to apply "utter failure" standard where plaintiff had received notice and opportunity to comment on proposed rule, and explaining that "[t]he Secretary's initial compliance with notice-and-comment procedures arguably means that the subsequent error does not rise to the level of an 'utter failure' to comply with the APA"); *see also Chamber of Com. v. SEC*, 443 F.3d 890,

904 (D.C. Cir. 2006) (describing the utter-failure cases as "involv[ing] the outright dodge of APA procedures"). That does not, however, completely absolve the Service. Rather, it means that, to show prejudice, Friends of Animals must satisfy "the slightly more stringent standard that normally applies where the procedural error at issue is failure to provide notice and comment." *See AFL-CIO*, 496 F. Supp. 2d at 89.

To satisfy that standard, a plaintiff need not establish "actual prejudice," *Sprint Corp. v. F.C.C.*, 315 F.3d 369, 377 (D.C. Cir. 2003), or supply proof that the agency "would have reached a different result," *Chamber of Com.*, 443 F.3d at 905. Rather, the plaintiff need only "indicate with reasonable specificity what portions of the [rule] it objects to and how it might have responded if given the opportunity." *Gerber*, 294 F.3d at 182 (internal quotation marks omitted). Put differently, "all that is required to defeat [the agency's] claim of harmless error" is a showing that the party could "mount a credible challenge" to the rule on remand. *Id.* at 184 (quoting *Util. Solid Waste Activities Grp. v. E.P.A.*, 236 F.3d 749, 755 (D.C. Cir. 2001)); *see also Sprint Corp.*, 315 F.3d at 377 (finding prejudice in part because petitioner "made a colorable claim that it would have more thoroughly presented its arguments had it known that the [agency] was contemplating a rulemaking"); *Sugar Cane Growers*, 289 F.3d at 97 (finding prejudice where plaintiffs "indicated additional considerations they would have raised in a comment procedure").

Under these principles, Friends of Animals has demonstrated that the lack of a meaningful opportunity to comment on the SPR analysis constituted prejudicial error. Plaintiff has indicated with "reasonable specificity," and even precision, the portion of the SPR analysis to which it objects and how it would respond if given the opportunity. *See Gerber*, 294 F.3d at 182. Specifically, Friends of Animals objects to the Service's determination "that the Panama and Colombia portions of [the Northern DPS's] habitat are small," *see* Pl.'s Reply at 13—an

argument that it expounds at length upon in its brief, *see* Pl.'s MSJ at 25–28.  Plaintiff also

plausibly argues that "it would have more thoroughly presented [its substantive] arguments in its

comment had it not focused its comment on questioning [the Service's] defective notice and

urging it to clarify that it sought all comments that might affect the SPR analysis."  *Id.*; *see also*

JA at FWS001111–15.  As explained above, all Friends of Animals must show is that it could

"mount a credible challenge" to the SPR analysis—or make a "colorable claim that it would have

more thoroughly presented its arguments"—on remand.  *See Sprint Corp.*, 315 F.3d at 377;

*Gerber*, 294 F.3d at 184.  Plaintiff has lodged a "credible" challenge, as well as a "colorable

claim" that it would have presented additional comments addressed to the substance of the SPR

analysis had it been given the opportunity.  Nothing more is required to establish prejudice.

### 3.   Remedy

Having concluded that the Service violated the APA by restricting the scope of public

comments on the SPR analysis, the Court must determine which of two available remedies,

vacatur or remand without vacatur, is the appropriate one.  "In general, 'vacatur is the normal

remedy' for a procedural violation" like the one the Service committed in this case.  *Nat. Res.*

*Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (quoting *Allina Health Servs.*, 746

F.3d at 1110)).  That fact notwithstanding, courts have discretion "to leave agency action in place

while the decision is remanded for further explanation."  *Standing Rock Sioux Tribe v. U.S. Army*

*Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).  Circuit precedent establishes two

factors that guide this discretion: "first, the seriousness of the [rule's] deficiencies, and, second,

the likely disruptive consequences of vacatur."  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d

510, 518 (D.C. Cir. 2020) (cleaned up) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory*

*Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).  "The 'seriousness' of a deficiency . . . is

determined at least in part by whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand." *Standing Rock*, 985 F.3d at 1051 (quoting *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008)).  Here, the Court finds that both factors weigh in favor of vacating the Service's SPR analysis.

As to the first factor, the Court finds that the Service's failure to provide the public a meaningful opportunity to comment on the SPR analysis is a "serious" deficiency.  *See Williams v. Walsh*, 648 F. Supp. 3d 70, 97 (D.D.C. 2022).  Although this is not a case in which the agency completely failed to provide notice and an opportunity to comment, *see, e.g.*, *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) (explaining that courts "typically vacate[] rules when an agency entirely fails to provide notice and comment" (quoting *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013))), the Service's failure to give the public a meaningful opportunity to comment is significant, especially given that the Service sought voluntary remand expressly to conduct an SPR analysis with the benefit of public comment, *cf. Penobscot Indian Nation v. U.S. Dep't of Hous. & Urb. Dev.*, 539 F. Supp. 2d 40, 48–50, 54 (D.D.C. 2008) (finding first *Allied-Signal* factor favored remand with vacatur in part because agency denied the public a meaningful opportunity to comment).

As for the second factor, the Court finds that there is essentially no likelihood that vacatur of the SPR analysis would lead to disruptive consequences.  That is because, regardless of whether remand of the SPR analysis is conducted with or without vacatur, the southern subspecies of scarlet macaw will remain listed as threatened and will accordingly continue to benefit from all of the protections established by the 2019 Final Rule.  All that being so, the Court will vacate the Service's SPR analysis, *see* 2023 SPR Analysis, 88 Fed. Reg. 19,549, and

remand for the Service to reconduct that analysis after soliciting and considering public comments on the relevant, substantive issues.

## C.  Plaintiff's Similarity-of-Appearance Arguments

Friends of Animals next argues that remand of the 2019 Final Rule is warranted for reasons related to the Service's "similarity of appearance analysis."  *See* Pl.'s MSJ at 32–39.  As discussed, Section 4(a) of the ESA grants the Service authority to list a species as endangered or threatened based on any one of five enumerated factors.  *See* 16 U.S.C. § 1533(a)(1).  In certain cases, the ESA also authorizes the Service to list a particular species as endangered or threatened based on its *similarity of appearance* to an endangered or threatened species, even if that particular species is not itself endangered or threatened.  *See id.* § 1533(e); *see also Ill. Com. Fishing Ass'n v. Salazar*, 867 F. Supp. 2d 108, 111 (D.D.C. 2012).  Specifically, Section 4(e) permits the Service to "treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that" three conditions are satisfied.  16 U.S.C. § 1533(e).  First, the species must "so closely resemble[] in appearance, at the point in question, a species which has been listed [as endangered or threatened] that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species."  *Id.* § 1533(e)(A).  Second, the Service must find that "the effect of this substantial difficulty is an additional threat to an endangered or threatened species."  *Id.* § 1533(e)(B).  And third, treating the unlisted species as endangered or threatened must "substantially facilitate the enforcement and further the policy of this chapter."  *Id.* § 1533(e)(C).  The Service has adopted regulations to implement Section 4(e).  *See* 50 C.F.R. § 17.50.  If the Service finds that the three Section 4(e) criteria are satisfied and the agency "wishes to afford a species special protections" based on its similarity of appearance to a listed species, the Service

may list the species with a notation indicating whether the species "is to be treated as threatened

or endangered." *Ill. Com. Fishing Ass'n*, 867 F. Supp. 2d at 111 (citing 50 C.F.R. § 17.50(a)).

Friends of Animals challenges two separate aspects of the Service's similarity-of-

appearance analysis.  The first challenge relates to the agency's treatment of the Southern DPS.

*See* Pl.'s MSJ at 32–36.  In the 2019 Final Rule, the Service determined that, although the

Southern DPS was not itself threatened or endangered, listing the Southern DPS as threatened

was warranted pursuant to Section 4(e).  *See* 2019 Final Rule, 84 Fed. Reg. at 6,308–09.  The

agency reasoned that the Southern DPS so closely resembles the Northern DPS, the northern

subspecies, and "subspecies crosses" of the southern and northern subspecies that law

enforcement would have difficulty distinguishing between the Southern DPS and the listed

species.  *Id.*  After finding that the other Section 4(e) factors were also satisfied, the agency

decided to list the Southern DPS as threatened.  *Id.*  Friends of Animals does not challenge the

agency's decision to *list* the Southern DPS based on a similarity-of-appearance rationale, but

argues that the agency failed to explain why—after determining that the Southern DPS is

visually indistinguishable from the endangered northern subspecies—it decided to list the

Southern DPS as merely threatened rather than endangered.  *See* Pl.'s MSJ at 34–36.

Plaintiff separately argues that the Service acted arbitrarily and capriciously by

completely failing to consider whether the Northern DPS should be listed as endangered (rather

than threatened) based on the Northern DPS's close visual resemblance to the northern

subspecies.  *See id.* at 36–39.  The Court will address Plaintiff's contentions in turn.

### 1.  The Service's Decision to List the Southern DPS as Threatened

Friends of Animals first argues that the Service failed to explain why it decided to list the

Southern DPS as threatened rather than endangered despite the similarity of appearance between

42

the Southern DPS and the northern subspecies.  *See id.* at 34–36.  The Service counters that Plaintiff's challenge fails at the threshold, either because it is inadequately pleaded, *see* Defs.' MSJ at 30–32, or because Friends of Animals lacks standing to contest the Service's findings regarding the Southern DPS, *see id.* at 34–37.  Alternatively, the Service argues that its decision to list the Southern DPS as threatened was both reasonable and adequately explained.  *See id.* at 37–39.

*a.  Standing*

The Court first considers the Service's contention that Friends of Animals lacks associational standing to challenge the agency's decision to list the Southern DPS as threatened based on similarity of appearance.[11]  To that end, the Service argues that Friends of Animals has failed to show that one of its members would have standing to challenge that determination in his own right.  *See id.* at 35–37.

Article III of the Constitution "restricts federal courts to the resolution of cases and controversies."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008).  The concept of "standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  It is well-established that "[s]tanding is not dispensed in gross"; rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Davis*, 554 U.S. at 734 (citations omitted).  Where, as here, an association asserts claims on its members' behalf, it must show that "(1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it

---

[11] Because the Court concludes that Plaintiff lacks standing to challenge the Service's listing decision regarding the Southern DPS, the Court does not address the agency's argument that Plaintiff's amended complaint does not contain claims that can plausibly be construed to challenge the Service's similarity-of-appearance determination for that DPS.  *See* Defs.' MSJ at 30–32.

seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).  To satisfy the first prong of this inquiry, the association "must show that: (1) at least one of its members has suffered an 'injury-in-fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury is 'fairly traceable to the challenged action'; and (3) it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).  At the summary judgement stage, the plaintiff may not rely on "mere allegations" but rather "must set forth by affidavit or other evidence specific facts" to establish the elements of standing.  *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 561).

Here, Friends of Animals argues that it has associational standing to challenge the Service's "failure to list [the Southern DPS] as endangered" by virtue of the fact that Gianfranco Gomez, a Costa Rican citizen and one of the organization's members, assertedly has standing to challenge the same.  *See* Pl.'s Reply at 15–16.  According to his declaration, Mr. Gomez enjoys seeing macaws in the area of Costa Rica in which he lives—that is, the Osa Peninsula on the Pacific Coast of Costa Rica—and he "want[s] to continue to be able to view [scarlet macaws] in the future."  *See* Pl.'s MSJ at 44; *see also* Decl. Gianfranco Gomez ("Gomez Decl.") at 2, ECF. No. 28-1.  But as the Service argues—and Friends of Animals does not and could not dispute—the macaws that live in the area of Costa Rica in which Mr. Gomez resides belong exclusively to the Northern DPS.  *See* Defs.' MSJ at 36–37.  The Service also correctly contends that Mr.

Gomez does not express in his declaration any intention to travel from Costa Rica to view scarlet macaws elsewhere. *See* Defs.' Reply at 19; *cf. Lujan*, 504 U.S. at 564 (finding that plaintiffs failed to establish "actual or imminent" injury where they failed to describe any "concrete plans" to observe endangered species in the wild). Instead, Mr. Gomez's declaration focuses on the pleasure he derives from seeing macaws where he lives, the ways in which scarlet macaws benefit ecotourism in that area, and his fear that if the population of macaws in western Costa Rica were to "continue[] to decline," he would be both "sadden[ed]" and harmed financially. *See* Gomez Decl. at ¶¶ 9–13, 15–16. His declaration does not, in other words, establish any actual or imminent harm that has or will likely accrue to him as a result of the Service's decision to list the *Southern* DPS as threatened.

In response, Plaintiff cursorily argues that Mr. Gomez's injury stems from the fact that, by listing the Southern DPS as threatened rather than endangered, the Service makes it possible for poachers, traders, or others involved in either the illegal or legal trade in macaws to "pass off" birds of the Northern DPS as birds of the Southern DPS. *See* Defs.' Reply at 16. This threat to the Northern DPS, Friends of Animals continues, harms Mr. Gomez and could be redressed by a decision requiring the agency to list the Southern DPS as endangered. *See id.* But this purported injury is far too conjectural. As it currently stands, the Northern DPS, like the Southern DPS, is listed as threatened, and both population segments are subject to the same restrictions on taking, import, and export. Consequently, to the extent someone wanted to traffic in scarlet macaws, there would be no need for that individual to "pass off" a macaw from the Northern DPS as a macaw from the Southern DPS. An individual could accomplish the same result—trading in Northern DPS macaws—simply by claiming (accurately) that the bird belonged to the Northern DPS.

For these reasons, the Court concludes that Mr. Gomez—the only member on which Plaintiff's claims to associational standing rely—does not have standing to challenge the Service's decision to list the Southern DPS as merely threatened.  And because Mr. Gomez does not "have standing to [challenge the Southern DPS listing] in [his] own right," Friends of Animals necessarily lacks standing to challenge the same.  *See Air All. Houston v. E.P.A.*, 906 F.3d 1049, 1058 (D.C. Cir. 2018) (citation omitted).

### b.  Merits

Even if Friends of Animals had standing to challenge the Service's decision to list the Southern DPS as threatened, its claims would fail on the merits.  In its initial motion, Friends of Animals argues that, once the Service determined that the Southern DPS closely resembled the northern subspecies, it should have listed the Southern DPS as endangered, not threatened.  *See* Pl.'s MSJ at 35.  It specifically contends that "because [the Service] found that [the Southern DPS is] similar in appearance to [the northern subspecies], it was arbitrary for [the Service] not to list [the Southern DPS] as endangered."  *Id.* (citation omitted); *see also id.* ("It makes no sense to list a DPS for its similarity of appearance to an endangered subspecies [the northern subspecies] but not give [the Southern DPS] that same endangered status.").  Though it would be fair to construe Plaintiff's position to be that, once the Service determines that a species closely resembles an endangered species, it *must* list the former as endangered, *see* Defs.' MSJ at 38, Plaintiff retreats from that contention in its reply brief, *see* Pl.'s Reply at 16–17 ("It may not be that [the Service] must list as endangered any species similar in appearance to an endangered species.").  Plaintiff's retreat is well-advised.  As discussed in greater detail below, Section 4(e) gives the Service a great deal of discretion to determine whether to list a species as endangered *or* threatened based on its similarity of appearance to a listed species.  *See* 16 U.S.C. § 1533(e).

Neither the statute nor its implementing regulations require the Service to list an unlisted species as endangered upon a finding that the unlisted species is similar in appearance to an endangered species.[12]  *See id.*; *see also* 50 C.F.R. § 17.50(a).

Though Friends of Animals thus seems to concede that the Service was not *required* to list the Southern DPS as endangered based on its similarity of appearance to the northern subspecies, Plaintiff argues that the Service still failed to adequately explain *why* it chose to list the Southern DPS as merely threatened based on a similarity-of-appearance rationale.  *See* Pl.'s Reply at 17.  In that vein, Plaintiff argues that the rationale the Service provided for listing the Southern DPS as threatened was "illogical" and based on "inconsistenc[ies]."  *See* Pl.'s MSJ at 34–35.  It also contends that the agency "offered no logical explanation" as to how listing the Southern DPS as threatened would adequately protect the northern subspecies.  *See id.* at 35–36.

Plaintiff's arguments are unpersuasive.  In the 2019 Final Rule, the Service explained in detail why it was exercising its discretion to treat the Southern DPS as threatened and how doing so would provide greater protection to the already-listed species of scarlet macaw.  *See* 2019 Final Rule, 84 Fed. Reg. at 6,308–09.  For example, the Service explained that listing the Southern DPS as threatened would "facilitate law enforcement actions to protect and conserve scarlet macaws" and make it more difficult for "importers and exporters [to] inadvertently or purposefully misrepresent a specimen of [the northern subspecies] or the [N]orthern DPS . . . as a specimen of" the Southern DPS.[13]  *Id.* at 6,309.  The Service further explained that listing the

---

[12] The Service notes that "all species currently protected under ESA Section 4(e) based on their similarity of appearance to a listed species are treated as threatened, regardless of whether the listed species they resemble is threatened or endangered."  Defs.' MSJ at 38 (citing 50 C.F.R. §§ 17.11–12).

[13] Plaintiff argues that the Service's findings were arbitrary in part because the Service recognized that failing to list the Southern DPS based on a similarity-of-appearance rationale would create a "loophole" through which individuals could pass off macaws of the northern

Southern DPS as threatened—coupled with the protections outlined in the Section 4(d) rule (discussed below)—would "provide greater protection" to the already-listed scarlet macaws, including the northern subspecies. *Id.* Having reviewed the whole record—and cognizant of the significant discretion that Congress vested in the Service to make similarity-of-appearance listing decisions, *see* 16 U.S.C. § 1533(e)—the Court finds that the Service satisfactorily discharged its duty to articulate a "rational connection between the facts found and the choice made" to list the Southern DPS as threatened. *See State Farm*, 463 U.S. at 43 (citation omitted).

2. The Service's Lack of Similarity-of-Appearance Analysis Concerning the Northern DPS

Friends of Animals next contends that the Service acted arbitrarily and capriciously by failing to consider whether to list the *Northern* DPS as endangered based on its similarity of appearance to the northern subspecies.[14]  *See* Pl.'s MSJ at 38–39.  The Service does not

---

subspecies and Northern DPS as birds of the Southern DPS.  *See* Pl.'s MSJ at 35; *see also* 2019 Final Rule, 84 Fed. Reg. at 6,309.  The Service explained, however, that this concern would be most applicable if the Southern DPS were to remain *unlisted*, and that listing the Southern DPS as threatened based on similarity of appearance would significantly shrink that loophole by "facilitat[ing] . . . law enforcement efforts to curtail unauthorized import and trade."  *See* 2019 Final Rule, 84 Fed. Reg. at 6,309.  That explanation makes sense, and Plaintiff cites no authority for the proposition that the Service acted arbitrarily and capriciously to the extent that it failed to close the loophole completely.

[14] To the extent the Service argues that Plaintiff's amended complaint fails to allege such a claim, *see* Defs.' MSJ at 30–32, the Court disagrees.  The amended complaint alleges that the Service "chose not to list . . . the Northern DPS[] as endangered, despite the similarity of appearance to the endangered northern subspecies."  Am. Compl. ¶ 116; *see also id.* ¶ 192 ("[The Service] failed to consider whether listing the Northern and Southern DPS of the southern subspecies was warranted because of the southern subspecies' similarity of appearance to the endangered northern subspecies.").  And Plaintiff's first cause of action claims that the Service violated the APA and ESA "[i]n issuing and affirming the Threatened Finding" in part because the Service allegedly "did not base the Threatened Finding on the best available scientific evidence" and "otherwise acted in a manner that was arbitrary, capricious, and contrary to law in violation of the ESA within the meaning of the APA."  *Id.* ¶ 204.  Accordingly, contrary to the Service's assertions, this is not a case in which Plaintiff has attempted to impermissibly "amend its complaint or broaden its claims through summary judgment briefing."  *See District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010).

dispute—nor could it—that birds of the Northern DPS are similar in appearance to birds of the northern subspecies.  *See* 2019 Final Rule, 84 Fed. Reg. at 6,282.  Nor does the Service dispute Plaintiff's assertion that it did not consider whether to list the Northern DPS as endangered based on similarity of appearance.  *See* Defs.' Reply at 18 (acknowledging that "the [Service] declined to consider treating the Northern DPS as endangered based on similarity of appearance").  Instead, the Service argues that it lacked authority to uplist the Northern DPS based on a similarity-of-appearance rationale once it found that the Northern DPS was threatened, *see* Defs.' MSJ at 32–33, and that even if it *had* authority to uplist the Northern DPS based on such a rationale, its decision not to uplist the Northern DPS was entirely discretionary and thus immune from judicial review, *see id.* at 33–34.  The Court disagrees on both fronts.

*a.  Section 4(e) Grants the Service Discretion to Uplist the Northern DPS*

Start with the Service's contention that, once the agency determined that the Northern DPS was threatened, it lacked authority to list the Northern DPS as endangered based on its similarity of appearance to the northern subspecies.  In advancing this argument, the Service relies on the text of Section 4(e), which provides that "[t]he Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species *even though it is not listed pursuant to this section* if he finds," among other things, that the two species so closely resemble one another that it would be difficult for law enforcement "to differentiate between the listed and *unlisted* species" and that treating the "*unlisted* species [as endangered or threatened] will substantially facilitate the enforcement and further the policy of" the ESA.  16 U.S.C. § 1533(e) (emphases added); *see* Defs.' MSJ at 32–33.  The Service argues that the emphasized language gives the agency discretion to treat a species as endangered or threatened based on similarity of appearance *only if*

the species is "*unlisted.*"  Defs.' MSJ at 32.  And because the Northern DPS was listed as

threatened, the Service says that Section 4(e) prohibited the agency from considering whether to

uplist the Northern DPS based on its similarity of appearance to the northern subspecies.[15]

The agency's interpretation of Section 4(e) is flawed.  To interpret Section 4(e), the Court

concentrates on the text of that provision.  *See Am. Fuel & Petrochemical Mfrs. v. E.P.A.*, 3 F.4th

373, 380 (D.C. Cir. 2021) (explaining that statutory construction "begins with the language

employed by Congress and the assumption that the ordinary meaning of that language accurately

expresses the legislative purpose" (internal alteration omitted) (quoting *Engine Mfrs. Ass'n v. S.

Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004))).  As noted, Section 4(e) grants the

Service discretion to "treat *any* species as an endangered species or threatened species even

though it is not listed pursuant to this section" if certain conditions are met.  16 U.S.C. § 1533(e)

(emphasis added).  "Read naturally, the word 'any' has an expansive meaning, that is 'one or

some indiscriminately of whatever kind.'"  *See Murray Energy Corp. v. E.P.A.*, 936 F.3d 597,

626 (D.C. Cir. 2019) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).  To be sure, "the

meaning of 'any' can differ depending upon the statutory setting."  *New York v. E.P.A.*, 443 F.3d

---

[15] The Service also draws support for this conclusion from the regulations implementing
Section 4(e).  *See* Defs.' MSJ at 33; Defs.' Reply at 16.  Those regulations state, in pertinent part,
that "[w]henever a species *which is not Endangered or Threatened* closely resembles an
Endangered or Threatened species, such species may be treated as either Endangered or
Threatened," if certain criteria are met.  50 C.F.R. § 17.50(a) (emphasis added).  Although the
language of the regulation thus supports the interpretation of the ESA that the Service advances
in its brief, the Service expressly disclaims that its interpretation of the statute is entitled to
deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
(1984).  *See* Defs.' Reply at 17 n.3.  Of course, now, that disavowal is entirely beside the point.
*See Loper Bright Enterprises v. Raimondo*, __ U.S. __, __ (2024) ("*Chevron* is overruled.").  But
even before *Loper Bright*, the Court would have only owed deference to the Service's
interpretation if the statute were ambiguous.  *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d
84, 92 (D.C. Cir. 2020).  And here, the Court finds that the statute unambiguously forecloses the
Service's interpretation of Section 4(e).

880, 885 (D.C. Cir. 2006).  If, for instance, "adopting the natural meaning of 'any'" would bring

about "strange and indeterminate results," there may be reason to question whether to give the

word "any" its natural meaning.  *Id.* (quoting *Nixon v. Mo. Mun. League*, 541 U.S. 125, 133

(2004)).  Here, however, the Service does not point to any "strange" or "indeterminate results"

that would emerge from adopting the natural meaning of "any" in Section 4(e).  *See id.*  And

indeed, given (1) that the "ESA's primary purpose is to conserve endangered and threatened

species," *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C.

Cir. 2011), and (2) that Section 4(e) is designed to further that purpose by enabling law

enforcement to better protect those species, the "strange" result would be if Section 4(e)

prohibited the Service from enacting stronger protections for an endangered species if it found

that a visually identical species was at slightly less risk of imminent extinction.

     The Court finds further support for giving "any" its usual, expansive meaning from the

fact that the Service's interpretation of the statute would render that term largely "insignificant"

if not "superfluous."  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (explaining that "[i]t is 'a

cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so

construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))); *New York*, 443 F.3d at

887 (same).  The Service's interpretation—which treats the "even though" clause as establishing

a necessary condition cabining the scope of the word "any"—would significantly shrink the

otherwise expansive nature of the provision such that it is unclear what work the term "any"

would do.  In contrast, Plaintiff's reading of the statute is consistent with the principle that courts

should "give effect, if possible, to every clause and word" of a statute.  *See Great Lakes Comnet,*

*Inc. v. F.C.C.*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (quoting *Duncan*, 533 U.S. at 174).  Under

Plaintiff's interpretation, the "even though" clause "simply clarifies that even unlisted species may be listed" based on their similarity of appearance to a listed species. *See* Pl.'s Reply at 19. The Court is persuaded by that reading of the statute, which both gives meaning to each term in Section 4(e) and better accounts for the expansive nature of the word "any." And, as noted in the preceding paragraph, it is also much more in keeping with the purpose underlying both Section 4(e) and the ESA as a whole.

> *b. The Service's Exercise of Discretion is Not Immune from Judicial Review*

In the alternative, the Service argues that the decision of whether "to perform a similarity of appearance analysis" is unreviewable because it is a type of agency action which Congress "committed to agency discretion by law." Defs.' MSJ at 34 (quoting 5 U.S.C. § 701(a)(2)). It is not.

The APA precludes judicial review where an "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to judicial review is "very narrow" and applies only in "rare instances" where there is "no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), or where there is "no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). To determine whether a matter has been committed to agency discretion, courts must "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (internal quotation marks omitted); *see also Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988) (per curiam) (stating that agency regulations may provide "law to apply" (internal quotation marks omitted)). And in making this assessment, the court must bear in mind "the strong presumption that Congress intends judicial

review of administrative action, and the court will not deny review unless there is persuasive reason to believe that such was the purpose of Congress." *Ramah Navajo Sch. Bd., Inc. v. Babbitt*, 87 F.3d 1338, 1343–44 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

Here, the Service relies principally on the text of Section 4(e) to argue that similarity-of-appearance determinations (or the lack thereof) are unreviewable. *See* Defs.' MSJ at 33–34. The agency argues that "[t]he discretionary nature of [Section 4(e)] is plain from the text of the statute, which states that . . . 'the Secretary *may*, by regulation of commerce or taking, and *to the extent he deems advisable*' make a similarity of appearance determination." *Id.* (quoting 16 U.S.C. § 1533(e)). But it is well-established that Congress's use of a permissive term like "may" "does not mean the matter *is committed* exclusively to agency discretion." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995); *see also Amador Cty. v. Salazar*, 640 F.3d 373, 380 (D.C. Cir. 2011) (rejecting argument that Congress's use of "may" in an Indian gaming statute vested the agency with unreviewable discretion). Rather, when, as here, "a statute uses a permissive term such as 'may' . . . , this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination." *Dickson*, 68 F.3d at 1401. But it does not render the agency's action or inaction automatically unreviewable. *Id.* at 1401–02 (collecting cases in which statutes using the word "may" were found reviewable); *see also Oakland Physicians Med. Ctr. v. Azar*, 330 F. Supp. 3d 391, 399 (D.D.C. 2018); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 103 (D.D.C. 2018). This conclusion is not upset by the fact that Section 4(e) also gives the Secretary discretion to issue a similarity-of-appearance listing "to the extent he deems [such a listing] advisable." *See* Defs.' MSJ at 34 (emphasis omitted) (quoting 16 U.S.C. § 1533(e)). In *Marshall County Health Care Authority v. Shalala*, the D.C. Circuit rejected the argument that a statute allowing the Secretary

under the Medicare program to make adjustments "as the Secretary deems appropriate"—
language that closely parallels the statutory text at issue here—committed such decisions solely
to agency discretion.  988 F.2d 1221, 1224 (D.C. Cir. 1993).

All that being so, the Court finds that although Section 4(e) entitles the Service to a good
deal of deference in determining whether to list a species as endangered or threatened based on a
similarity-of-appearance analysis, *see, e.g.*, *Dickson*, 68 F.3d at 1401, *Oakland Physicians Med.
Ctr.*, 330 F. Supp. 3d at 399, the statute does not foreclose judicial review.  This finding is
buttressed by the fact that Section 4(e) contains a "judicially manageable standard" to assess the
Secretary's exercise of discretion.  *See Heckler*, 470 U.S. at 830 (stating that "if no judicially
manageable standards are available for judging how and when an agency should exercise its
discretion, then it is impossible to evaluate agency action for 'abuse of discretion'").  The statute
makes plain that the Secretary's decision to list (or not list) a species based on similarity of
appearance must be based on three specific criteria.  *See* 16 U.S.C. § 1533(e)(A)–(C).  And the
statute's implementing regulations provide further detail regarding the factors that are to drive
the Secretary's assessment.  *See* 50 C.F.R. § 17.50(b)(1)–(3); *see also Ctr. for Auto Safety*, 846
F.2d at 1534 (explaining that "regulations promulgated by an administrative agency in carrying
out its statutory mandate can provide standards for judicial review of agency action . . . to
overcome the presumption against reviewing administrative agency inaction").

For these reasons, the Court rejects the Service's contention that the APA prohibits
review of the agency's complete failure to explain why it chose not to even consider a similarity-
of-appearance listing for the Northern DPS.  And because the administrative record contains
evidence suggesting that there would have been a basis for the Service to at least consider
exercising its discretion to list the Northern DPS as endangered pursuant to Section 4(e), *see*

Pl.'s MSJ at 36–38 (discussing that evidence), the Court concludes that it was arbitrary and capricious for the agency not to explain its thinking on the issue at all.

### 3.   Remedy

Because the Court finds that the Service inadequately explained its decision not to consider listing the Northern DPS as endangered based on a similarity-of-appearance rationale, the Court must further assess whether to vacate the 2019 Final Rule or remand without vacatur. "While unsupported agency action normally warrants vacatur, a court is not without discretion to leave agency action in place while the decision is remanded for further explanation." *Standing Rock*, 985 F.3d at 1051 (internal alteration and quotation marks omitted). The Court will exercise that discretion here.

As discussed above, "[t]he decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Am. Pub. Gas Ass'n*, 72 F.4th at 1342 (quoting *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)).  Here, the deficiency identified in the 2019 Final Rule—the Service's lack of explanation for why it decided not to consider listing the Northern DPS as endangered based on similarity of appearance—is relatively minor and also has "a real possibility of being cured by further explanation on remand." *See Nat. Res. Def. Council*, 597 F. Supp. 3d at 95; *see also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied–Signal* counsels remand without vacatur."). On remand, the Service may, for instance, be able to explain why it exercised its significant discretion not to consider a similarity-of-appearance listing for the Northern DPS, or it may decide to reconsider uplisitng the Northern DPS based on such a rationale.  Either way, the first

*Allied Signal* factor favors remand without vacatur in light of the "serious possibility that the

[agency] will be able to substantiate its decision on remand." *See Resolute Forest Prod., Inc. v.*

*U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 103 (D.D.C. 2015) (citation omitted).

The second *Allied Signal* factor counsels even more strongly in favor of remand without

vacatur.  Vacatur would require the Service to completely re-examine, at the very least, the

listing decision pertaining to the Northern DPS.  During that time period, the Northern DPS

would not be listed, and thus would lose the important protections provided by the 2019 Final

Rule.  This highly disruptive outcome is not warranted, particularly given the fact that, in almost

all material respects, "the Service's work was generally thoroughgoing and its findings

reasoned." *See Nat. Res. Def. Council*, 597 F. Supp. 3d at 95–96 (finding "a full do-over" of the

Service's ESA listing decision unwarranted where the Service's errors were relatively minor,

there was a good chance the Service would reach the same result following a limited remand,

and the Service's work was mostly thorough and reasoned).  For these reasons, the Court will not

order vacatur of the 2019 Final Rule or the Service's decision to list the Northern DPS as

threatened, and will instead remand the issue to the agency for further explanation.

### D.  Plaintiff's Challenges to Section 4(d) Rule

Finally, Plaintiff challenges the Service's decision, pursuant to Section 4(d), to adopt a

species-specific rule that extends most—but not all—of the protections encompassed in 16

U.S.C. § 1538(a)(1) to the southern subspecies of scarlet macaw as well as crosses of the two

scarlet macaw subspecies.  *See* Pl.'s MSJ at 39.  As mentioned above, Section 4(d) of the ESA

mandates that "[w]henever any species is listed as a threatened species . . . , the [Service] shall

issue such regulations as [it] deems necessary and advisable to provide for the conservation of

such species."  16 U.S.C. § 1533(d).  The Service "may by regulation prohibit with respect to

any threatened species [of wildlife] any act prohibited under 16 U.S.C. § 1538(a)(1)."  *Id.*
Pursuant to this authority, the Service has issued a regulation that automatically extends to all
threatened species the ESA's protections for endangered species unless, as here, the Service has
issued a special rule to govern a particular species.  50 C.F.R. § 17.31(a), (c); *see also Sweet
Home*, 1 F.3d at 5.

The Section 4(d) rule that the Service issued in this case allows, in certain circumstances,
for macaws that are listed as threatened to be imported, exported, and conveyed in interstate
commerce without an ESA permit.  *See* 2019 Final Rule, 84 Fed. Reg. at 6,309–10.  Plaintiff
attacks the Section 4(d) rule on two main grounds.  First, Plaintiff challenges the reasoning and
explanation that led the Service to adopt the rule: it argues that the Service failed to explain how
the Section 4(d) rule is "necessary and advisable," *see* Pl.'s MSJ at 39–40, and that the
explanation that the Service did provide is inconsistent with other aspects of the 2019 Final Rule
and the evidence before the agency, *see id.* at 40–42.  Second, Plaintiff contends that the Section
4(d) rule impermissibly treats captive macaws different than wild macaws, *see id.* at 42–44.
Neither of these contentions is persuasive.

1. The Service Adequately Explained the Challenged Features of the Section 4(d) Rule

Plaintiff first argues that the Service did not explain why the Section 4(d) rule was
"necessary and advisable" for the conservation of scarlet macaws.  *See* Pl.'s MSJ at 40, *see also*
16 U.S.C. § 1533(d) (requiring the Service to issue any regulations it "deems necessary and
advisable to provide for the conservation of [a threatened] species").  In doing so, Plaintiff
appears to contend that the Service needed to explain why *allowing* the import, export, and
interstate trade in macaws under certain circumstances and without an ESA permit would aid in
the conservation of the species.  *See* Pl.'s MSJ at 39–40; *see also* Pl.'s Reply at 22 ("Friends of

Animals is not arguing that [the Service] erred *merely* for its divergence from the general rule

that affords threatened species the same protections afforded to endangered species.  Instead, [the

Service] erred because it failed to provide a rational explanation for why the provisions of the

Special Rule are 'necessary and advisable.'" (emphasis added)).  To the extent Plaintiff argues

that the Service needed to justify its decision *not* to extend the blanket prohibitions contained in

50 C.F.R. § 17.31(a), Plaintiff is incorrect.  As another court in this district has explained,

"[n]othing in [50 C.F.R. § 17.31], or in the ESA itself, requires the agency to demonstrate a

conservation basis for *not* applying the general regulation at 50 C.F.R. § 17.31(a)."  *In re Polar

Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 229 (D.D.C.

2011).  Accordingly, here, "the Service was not required to demonstrate that diverging from the

general regulation at 50 C.F.R. § 17.31(a) is necessary and advisable to provide for the

conservation of the" scarlet macaw.  *Id.* at 230.

But even were that not the case, Plaintiff's argument fails on its own terms.  That is

because the Service adequately explained why the Section 4(d) rule it adopted was necessary and

advisable to provide for the conservation of the scarlet macaw.  As the Service emphasizes, the

Section 4(d) rule "generally extends the protections afforded to endangered species – including

take prohibitions – to threatened scarlet macaws, with the narrow exception that import and

export of certain scarlet macaws and certain acts in interstate commerce are allowed without an

ESA permit."  Defs.' MSJ at 40–41 (footnote omitted).  The agency explained that its decision to

allow for the limited, ESA-permit-free import and export of certain scarlet macaws was based in

part on the fact that cross-border trade in those birds is already significantly restricted by existing

regulatory regimes: specifically, those established under the Convention on International Trade

in Endangered Species of Wild Fauna and Flora ("CITES") and the Wild Bird Conservation

ACT ("WBCA")—a fact that even Plaintiff tacitly acknowledges.  *See* 2019 Final Rule, 84 Fed.

Reg. at 6,309–10; *see also* Pl.'s MSJ at 40 (acknowledging that the Service based its decision on

"the protections afforded to scarlet macaws by the [WBCA] and the [CITES]").  The Service

further explained that CITES and the WBCA already provide "broad protections" to scarlet

macaws, and that CITES specifically "contributes to the conservation of the [scarlet macaw] by

regulating international trade and ensuring that trade in [scarlet macaws] is not detrimental to the

survival of the species."  2019 Final Rule, 84 Fed. Reg. at 6,310; *see also In re Polar Bear*, 818

F. Supp. 2d at 233 (upholding Section 4(d) rule based, in part, on the Service's "reasonabl[e]

conclu[sion] that a complementary management regime encompassing [specific treaties and

statutes] . . . provide[d] for the conservation of the polar bear").

　　　These protections were not the only factor that led the agency to conclude that limited

import and export of scarlet macaws would pose very little additional threat to the species.

Rather, the agency also explained that "[t]he best available data indicate that the current threat of

trade of the scarlet macaw stems mainly from illegal trade that *stays within* the domestic markets

of Central and South America."  *Id.* (emphasis added).  "[T]he general prohibitions on import

and export contained in" 50 C.F.R. § 17.31, however, do not apply outside of the United States,

and thus the agency concluded that adopting those prohibitions "would not regulate" illegal trade

occurring entirely within Central and South America.  *Id.*  Finally, the agency found that, in light

of "existing laws" such as the WBCA and those enacted under CITES, "streamlin[ing] the

permitting process" by not requiring, in some cases, an additional permit under the ESA was an

additional factor that favored somewhat looser restrictions on import and export.  *Id.*; *see also In*

*re Polar Bear*, 818 F. Supp. 2d at 233 (upholding Section 4(d) rule based, in part, on the

Service's "reasonabl[e] cho[ice] to minimize administrative redundancy after it determined that doing so would not sacrifice significant conservation benefits").

The Service also adequately explained its decision to allow, in certain circumstances, the delivery, receipt, transport, and shipment of scarlet macaws in interstate commerce without an ESA permit.  On that front, the Service stated that it "ha[d] no information that suggests current interstate commerce activities are associated with threats to the scarlet macaw or would negatively affect any efforts aimed at the recovery of wild populations of the species."  2019 Final Rule, 84 Fed. Reg. at 6,310; *see also id.* at 6,279 ("[I]nterstate commerce within the United States is not a current threat to the scarlet macaw and will not affect any efforts to recover wild populations.").  And "[b]ecause the species will be otherwise protected in the course of interstate commercial activities under the take provisions and foreign commerce provisions contained in 50 [C.F.R. §] 17.31 as applied to this species," the agency concluded that the Section 4(d) rule "contains all the prohibitions and authorizations necessary and advisable for the conservation of the scarlet macaw."  *Id.* at 6,310.

All that being so, the Court finds that the Service reasonably determined that—and adequately explained how—the prohibitions and exceptions set forth in the Section 4(d) rule for the scarlet macaw are "necessary and advisable to provide for the conservation of [the] species," in accordance with Section 4(d) of the ESA.  *See Ctr. for Biological Diversity*, 2023 WL 6388936, at *28 (explaining that, in issuing Section 4(d) rule, the Service must "articulate an *adequate* explanation for its action," and that court must uphold the rule so long as it "can reasonably discern the agency's path" (cleaned up)).  As another court in this district previously explained, Congress gave the Service broad discretion "to determine what measures are

necessary and advisable to provide for the conservation of threatened species." *See In re Polar Bear*, 818 F. Supp. 2d at 234.  The Court discerns no abuse of that broad discretion here.

In resisting this conclusion, Plaintiff argues that the Service's justification for the Section 4(d) rule is inconsistent with other aspects of the agency's listing decision.  *See* Pl.'s MSJ at 40–42.  It is not.  For instance, Friends of Animals argues that, by allowing limited ESA-permit-free import and export of some scarlet macaws, the Section 4(d) rule is inconsistent with the Service's similarity-of-appearance listing of the Southern DPS.  *See id.* at 41–42.  Recall that the Service listed the Southern DPS as threatened in part to prevent traders from passing off listed scarlet macaws as unlisted ones, thereby making it easier for law enforcement "to curtail *unauthorized* import and trade" in endangered and threatened macaws.  *See* 2019 Final Rule, 84 Fed. Reg. at 6,309 (emphasis added); *see also* Pl.'s MSJ at 41.  The similarity-of-appearance listing was not meant to prohibit *all* import, export, and trade of scarlet macaws.  And although the Service certainly *could have* issued a Section 4(d) rule that banned all cross-border trade in scarlet macaws—which would, of course, make it even easier for law enforcement to prevent "unauthorized import and trade" given that *all* import and trade would be prohibited—the Service was under no obligation to do so.

The same reasoning also undercuts Friends of Animals's contention that the Section 4(d) rule "flies in the face" of certain evidence in the record, such as evidence showing that scarlet macaws (or scarlet macaw remains) are seized by law enforcement more often than any other non-North American bird.  *See* Pl.'s MSJ at 41–42.  Had the Service decided that a blanket ban on import and export was warranted, such evidence would likely have supported the Service's decision to institute such a ban.  But that does not mean that the evidence simultaneously *compelled* the Service to ban all imports and exports.  Rather, the Service's obligation was

simply to explain why the Section 4(d) rule it did decide to enact was "necessary and advisable to provide for the conservation of" scarlet macaws, *see* 16 U.S.C. 1533(d)—an obligation which, as explained above, the Service satisfactorily discharged.

2. The Section 4(d) Rule Does Not Impermissibly Distinguish Between Captive and Wild Macaws

Lastly, Friends of Animals contends that the Section 4(d) rule impermissibly distinguishes between captive and wild scarlet macaws by allegedly assigning the former a separate legal status from the latter. *See* Pl.'s MSJ at 42–44. In support, Plaintiff draws comparisons to a 2015 rulemaking in which the Service rescinded a previous rule that had listed captive chimpanzees as threatened and wild chimpanzees as endangered. *See id.* at 43–44 (citing Listing All Chimpanzees as Endangered Species ("Chimpanzee Rule"), 80 Fed. Reg. 34,500 (June 16, 2015)). The Service reasoned that its earlier listing decision rested on a misinterpretation of the ESA and that, contrary to its prior interpretation of the statute, the ESA "does not allow for captive chimpanzees to be assigned separate legal status from their wild counterparts on the basis of their captive state." Chimpanzee Rule, 80 Fed. Reg. at 34,501; *see also id.* at 34,524 ("Congress did not intend for captive specimens to be subject to separate legal status on the basis of their captive state.").

The parallels that Plaintiff attempts to draw between the chimpanzee listing and the Section 4(d) rule are unpersuasive. As the Service correctly argues, *see* Defs.' MSJ at 44–45, prior to 2015, the agency had treated captive chimpanzees and wild chimpanzees as "separate listable entities," *see* Chimpanzee Rule, 80 Fed. Reg. at 34,501, 34,504–05. Here, by contrast, the Service has not treated captive and wild scarlet macaws as separate listable entities, nor has it "assigned a different 'legal status' to captive scarlet macaws – all scarlet macaws, captive or not, have a legal status of endangered if they are in the northern subspecies and threatened if they are

in the Northern DPS or Southern DPS."  Defs.' MSJ at 44–45.  Indeed, in the 2016 Proposed

Rule, the Service expressly declined commenters' suggestion to assign captive scarlet macaws a

distinct legal status, explaining that "it would not be appropriate to differentiate the legal status

of captive-held animals of scarlet macaw from those in the wild."  2016 Proposed Rule, 81 Fed.

Reg. at 20,303.

In sum, the Court holds that the Service adequately explained its decision to enact the

Section 4(d) rule and the provisions contained therein.  The Section 4(d) rule was, in other

words, properly promulgated and will not be set aside.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (ECF No. 28) is

**GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion for Summary

Judgment (ECF No. 29) is **GRANTED IN PART AND DENIED IN PART**.  To the extent that

the Court has determined that certain aspects of the listing decision warrant further explanation,

those issues will be remanded to the agency either with or without vacatur as described above.

The Court will, however, defer final decision on the precise parameters and duration of that

remand.  Accordingly, it is **ORDERED** that the parties meet, confer, and submit a joint proposal

on the scope and duration of the remand on or before August 12, 2024.  If the parties are unable

to substantially agree on the parameters of the remedy, they shall file separate proposals by the

same date.  An Order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  July 10, 2024                                                    RUDOLPH CONTRERAS
                                                                        United States District Judge